F. DOUGLAS COCHRANE & others *vs.* ALLAN FORBES
& others, trustees, & others.

Suffolk. October 23, 1925. — October 13, 1926.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & SANDERSON, JJ.

*Arbitrament and Award. Contract,* For arbitration, Validity, Assignment, Construction, Performance and breach, Implied. *Assignment. Equity Jurisdiction,* Accounting.

An award by an arbitrator, even if the arbitration proceedings were in accordance with the requirements of G. L. c. 251, is not conclusive until judgment has been entered thereon under § 10 of that statute and, until that time, does not constitute a bar to a suit to enforce one of the claims included in the arbitration.

In a suit for money had and received by the defendant to the use of the plaintiff, it appeared that the plaintiff and the defendant had made three agreements in writing providing for periodical payments by the plaintiff to the defendant for oil to be produced by the defendant from a certain well in Mexico and delivered to the plaintiff, the defendant in the contracts representing the well to be of ample capacity for such production; that the plaintiff had made certain payments without taking the oil, and that later, when he demanded delivery of the oil, the well had become exhausted and production had been discontinued by the defendant. *Held,* that

(1) The record did not require this court as a matter of law to reverse findings by the trial judge that the payments made under the contracts had been made by the plaintiff, although it appeared that without assent by the defendant the plaintiff had assigned his interest in the contracts to a corporation in return for shares of its stock and that two days later that corporation had assigned the same interest to a second corporation, detailed facts found by the judge warranting his findings and the plaintiff's agreement with the corporation not affecting the defendant's rights;

(2) Provisions of the contract in effect that, if the well should fail and the defendant should not therefore be able to meet his contract obligations, the defendant upon giving notice should be excused from his obligations and should not be answerable in damages because of his inability to deliver oil, were not provisions to the effect that the defendant should not be bound to return money paid in advance for oil which he thus was excused from delivering;

(3) The contracts containing no provision for the return of money paid for oil which the defendant was unable to deliver, an obligation to make such restitution was imposed upon the defendant by law.

In Massachusetts, when a contract is terminated because performance has become impossible, a party who has made payments under it for which no consideration has been given may recover them, if there is no provision in the contract precluding such recovery; and, if a party has furnished materials or rendered services or delivered goods, the law creates a liability to pay their value to be determined by the price stipulated in the contract, or in some other way if the contract price cannot be made applicable. Per SANDERSON, J.

In the circumstances above described, it was *held,* that the contract price for oil delivered could be made applicable under the rule above stated and no sufficient reason appeared for applying any other standard.

The second of the contracts above described, in cl. 1, required the defendant to deliver to the plaintiff or to his nominee, and the plaintiff to accept or cause his nominee to accept and pay for, oil in specified minimum and maximum amounts for each month of the term of the contract, and in a later clause provided that the plaintiff in his uncontrolled discretion might "postpone acceptance" of the oil so specified to a certain limited aggregate amount, but that he should pay for such oil "as if deliveries had been accepted in accordance with the terms of Clause 1 hereof"; title to the oil was to pass upon delivery to the plaintiff. The contracts were based upon representations therein by the defendant

as to amounts of proved production of oil by the well. The exhaustion of the well was due to the fact that other wells were drawing from the same pool. It did not appear that the parties knew that drafts from other wells were reducing the supply from the well designated in the contract. *Held*, that

(1) To make the buyer responsible for goods before delivery, it must appear that delivery was delayed through his fault;

(2) "Fault" means wrongful act or default;

(3) The undelivered oil was not at the plaintiff's risk and in postponing acceptance of delivery according to the provisions of the contract the plaintiff was not at fault;

(4) The words, "as if deliveries had been accepted," did not give the defendants the right to retain the money paid for oil in reliance upon the defendant's promise to deliver it in the future when it appeared that the future deliveries were not made and could not be made because of exhaustion of the well.

On November 30, 1920, the defendant gave the plaintiff notice that the well in question had been shut down indefinitely. In December, 1920, the plaintiff made demand for return of the money paid for oil not delivered and pressed that claim in proceedings before an arbitrator. On May 20, 1922, before bringing this suit, the plaintiff gave notice that, the well having been unproductive and having been abandoned and further performance of the contract having become impossible, the contracts were terminated, and renewed his demand for return of payments made for oil not delivered. *Held*, that

(1) Such notice was sufficient to terminate the contract if notice for that purpose were required;

(2) In this case, it having become impossible for the defendant to fulfil his contract because of exhaustion of the well, notice from the plaintiff that he would terminate the contract would not affect the rights of either party.

(3) The plaintiff did not lose his right to maintain the suit by reason of the fact that he had pressed the claim before an arbitrator under an agreement for arbitration, where it appeared that no judgment had been entered in the arbitration proceedings under the provisions of G. L. c. 251, § 10.

In the suit above described, it appeared that the defendant was an association acting under a declaration of trust for the benefit of shareholders; that the plaintiff was a shareholder, and that from the money paid by the plaintiff which he was seeking to have returned, the defendant had made payments to the shareholders, among them the plaintiff. *Held*, that

(1) No sufficient reason appeared for deducting from the amount payable to the plaintiff the sums represented by payments made by the defendants of commissions or royalties or of profits to shareholders other than the plaintiff;

(2) As to the part of the profits paid the plaintiff as shareholder, the defendant might withhold from him the sum, if any, that was properly chargeable to the money received from the plaintiff for oil not delivered.

BILL IN EQUITY, filed in the Superior Court on June 30, 1922, and afterwards amended, for the establishment of a claim against trustees acting under the name Boston Mexican Petroleum Trustees, and to reach and apply in payment thereof shares of a corporation owned by them.

In the Superior Court, the suit was heard by *Hammond,* J. It appeared that there were three contracts involved in the suit; one between the plaintiff and the Boston Mexican Leasing Company dated December 20, 1918; a second dated November 19, 1919, between the plaintiffs and the defendant trustees; and a third dated July 22, 1920, between the plaintiffs and the defendant trustees.

On September 24, 1919, in response to a letter from the plaintiffs as to the status of payments by the plaintiffs for oil, delivery of which had been postponed, the defendant trustees wrote the plaintiffs a letter containing the following:

"The Trustees are of the opinion that if the payments are made at the times which the contract contemplates, though the deliveries have not been made, you should be permitted to take this oil in later periods on giving reasonable preliminary notice of the times when you will take it, provided delivery may be made without in any way standing in the way of the performance of any contracts which may be outstanding hereafter made with other purchasers of oil and providing that we are not called upon in any way to increase our plant or our operating expenses in order to make larger deliveries in any period than would have been required in order to fulfill the contract strictly in accordance with its terms.

"In return for the above, we understand that Messrs. Cochrane, Harper & Company undertake that they will take all the oil required in their business from us during the period of the contract, except the minimum amounts which they are obliged to take from other concerns under contracts which they have heretofore made."

On the same subject, paragraph 18 of the contract of November 19, 1919, read in substance as follows:

"(18) During the period beginning July 1st, 1919, and ending June 30th, 1924, Cochrane, Harper & Company in

their uncontrolled discretion may postpone acceptance of the petroleum which they are required to take hereunder and under the first contract and specified in Clause 1 hereof, to an aggregate amount not exceeding one million (1,000,000) barrels . . . but they shall pay for such petroleum as if deliveries had been accepted in accordance with the terms of Clause 1 hereof. Cochrane, Harper & Company may require the Trustees to make delivery of the petroleum so postponed at any time before July 1st, 1929, and the Trustees shall deliver such petroleum as and when they may be requested in writing so to do by Cochrane, Harper & Company, provided, however, that the Trustees may not be required to make such delayed deliveries in such manner or at such times as shall interfere with the performance of other contracts for the sale of petroleum which may have then been entered into by them or in such manner as will require additions to or changes in their operating facilities, but Cochrane, Harper & Company shall be entitled to receive such postponed deliveries even though the Trustees may not be able to make delivery thereof until after June 30, 1929.''

Paragraph 16 of the contract of November 19, 1919, read as follows:

''(16) As to the period beginning December 1st, 1919, and ending June 30th, 1923, Cochrane, Harper & Company, with the written consent of the Trustees, may substitute for themselves as the contracting party to this and the first contract, such corporation as they may desire, provided, however, that the Trustees shall not be required to give such written consent until they are reasonably satisfied as to the financial strength and character of the substituted corporation and until such substituted corporation shall have entered into a written undertaking with the Trustees to perform all of the obligations undertaken by Cochrane, Harper & Company under the first contract and under this agreement. The giving of such consent by the Trustees shall be wholly optional with them.''

The judge found that fourteen payments were made by the plaintiffs to the defendants under the contracts from

August, 1919, to and including November, 1920, amounting in all to $383,866.19. He further found as follows:

"The defendants say that the money which they have received under the contract was not the plaintiff's money, but was the money of the Canada Mexico Oil Company, it being asserted that the latter company made these payments under the contract 'in its own right' with the checks of its banker Cochrane, Harper and Company.

"In regard to this contention I find as follows: As previously stated, the plaintiffs, Cochrane, Harper and Company, on April 5, 1919, assigned their interest in the first contract of December, 1918, to the Foreign Development Company, together with various other agreements and shares of stock. In return Cochrane, Harper and Company received seven thousand seven hundred and ninety-five shares stock in the Foreign Development Company and promissory notes amounting to $71,500. . . .

"The payments which were made to the defendants under the contracts were made partly by checks of Cochrane, Harper and Company and partly by checks of the Canada Mexico Oil Company, and in one instance by the check of the New England Oil Corporation. The New England Oil Corporation, in June, 1920, owned fifty-one per cent of the capital stock of the Canada Mexico Oil Company, Limited. About June, 1920, it took over the operation of the various oil contracts in which Cochrane, Harper and Company were interested, including those in question in this case. [Here follows a tabulated statement as to the fourteen checks covering the fourteen payments in question.]

"The bills in all instances were rendered by the trustees to Cochrane, Harper and Company. Cochrane, Harper and Company had a running account with the Canada Mexico Oil Company, Limited, covering various transactions, upon the debit side of which the ten payments above mentioned were included as charged against the Canada Mexico Oil Company. Upon the credit side of the account appeared among other things payments made by the latter company to Cochrane, Harper and Company for oil which had

been paid for by the latter under the contracts with the trustees. . . .

"The defendants knew of the assignments of April, 1919, from Cochrane, Harper and Company to the Canada Mexico Oil Company through the Foreign Development Company. It did not appear, however, that either of said companies had been substituted by consent of the Trustees for the plaintiffs as one of the contracting parties under § 16 of the contract of November, 1919.

"Of the fourteen payments made to the defendants . . . the first ten (which were made by checks of Cochrane, Harper and Company) were covered by a double set of vouchers, in the following manner: The Trustees rendered monthly bills to Cochrane, Harper and Company which the latter paid by their own checks. Receipts for these payments were signed by the treasurer of the Trustees upon voucher forms of Cochrane, Harper and Company which were kept and filed by them and constituted one set of vouchers. The original monthly bills above mentioned were turned over by Cochrane, Harper and Company to the Canada Mexico Oil Company, were carried in the voucher files of that company and composed the other set of vouchers.

"The last four payments (which were made one by check of the New England Oil Corporation and three by checks of the Canada Mexico Oil Company) were covered only by one set of vouchers, i.e., the monthly bills aforesaid, and the cancelled checks, and these vouchers were carried in the voucher files of the Canada Mexico Oil Company.

"The check of July 20, 1920, of the New England Oil Company was sent to the Trustees by that corporation, and the three checks of the Canada Mexico Oil Company were sent to the Trustees by the latter company. Cochrane, Harper and Company, so far as it appeared in evidence, did not repay to these two companies the amounts of these respective checks.

"Cochrane, Harper and Company, who were bankers, had a general running account with the Canada Mexico Oil Company which was one of its customers. This account, which was carried on the 'customers' ledgers' so called of

Cochrane, Harper and Company, covered a period from March, 1919, to July, 1920, and contained items of debit and credit with respect to the Boston Mexican Petroleum Trustees' contracts as well as many items not connected with those contracts. As already stated, among the items charged against the Canada Mexico Oil Company upon this account were the ten payments made by Cochrane, Harper and Company to the defendants. The precise nature of the particular credits appearing on this account and relating to the contracts in question did not definitely appear from the evidence. The entries seem to describe the full monthly minimum quantities of oil taken at the contract price. It was not shown that these entries related to cash paid by the Canada Mexico Oil Company to Cochrane, Harper and Company."

Other material facts found by the trial judge and the terms of a report by him to this court under G. L. c. 214, § 30, are stated in the opinion.

*J. Noble*, (*A. P. Loring* with him,) for the plaintiffs.

*E. F. McClennen*, for the defendants.

SANDERSON, J. The plaintiffs are copartners and bring this suit to recover money alleged to have been paid by them for petroleum which the Boston Mexican Petroleum Trustees (hereinafter called the defendants) failed to deliver because of exhaustion of the Harmon well in Mexico, and to reach and apply certain stock held by them. The suit was begun June 30, 1922.

The defendants pleaded in bar the award of an arbitrator, filed in court May 13, 1922. The report remained unopened until the hearing of this suit on the merits in the Superior Court and no judgment has been entered thereon. The plea that the award is a bar to the suit was overruled, and the appeal by the defendants from this order raises the first question to be decided.

The arbitrator expressly excluded from his findings the plaintiffs' claim for money advanced for undelivered oil, upon the ground that the question was not before him. He ruled in substance that because of the provision in the contract relating to the failure of the well there could be no

implied condition respecting that matter, and decided that the contract had not been terminated. If an arbitrator leaves undecided the principal matter submitted to him his award is no bar to an action on the same matter. *Smith* v. *Holcomb*, 99 Mass. 552. The agreement for arbitration complied in many respects with the requirements of the statute but it contained a provision to the effect that the award was to be "immediately, absolutely and finally binding on all parties upon its being filed." It also provided that the party for whom the award was given might have judgment entered and take out execution. In this Commonwealth agreements to arbitrate which oust the courts of jurisdiction are invalid. See *Miles* v. *Schmidt*, 168 Mass. 339, 340, and cases cited. An agreement for submission under the statute which departs in matter of substance from the statutory requirements is void. See *Nay* v. *Boston & Worcester Street Railway*, 192 Mass. 517, 521. If the agreement for arbitration in the case at bar is valid it is because construed to be a submission under the statute and if so construed the award would not be conclusive until the entry of judgment thereon. See G. L. c. 251, § 10. *Todd* v. *Old Colony & Fall River Railroad*, 3 Allen, 18. The parties agreed not to institute any suit before the conclusion of the arbitration proceedings, but the defendants did not base their plea upon the ground that the arbitration proceedings were not concluded and that the suit was prematurely brought for that reason. The order overruling the plea was right.

The judge who heard the case on the merits reported it for determination by this court upon the pleadings, findings and order for a decree, statement of exceptions and errors claimed, supplementary findings and interlocutory decree. This decree provides "that the plaintiffs may rescind the contracts set out in their bill of complaint, and recover the sum paid by them for petroleum which the defendants have failed to deliver to them, upon condition that they credit to the defendants against said sum the difference, if any, between the market value of the oil which the defendants have delivered to them, taking such value at the time and place of such delivery, and the price paid for such oil," and leaves

undecided the question whether the defendants are personally liable for any sum in excess of the trust property. The order was also made that the case stand for further hearing in accordance with the decree.

After the report of the arbitrator was filed, the plaintiffs notified the defendants, by letter dated May 20, 1922, that "Inasmuch as the Harmon Well has become unproductive and been abandoned, and further performance of our contracts of December 20, 1918 with the Boston-Mexican Leasing Company and of November 19, 1919 and July 22, 1920 with yourselves has become impossible upon your part, please take notice that said contracts are terminated." In the letter reference was made to the fact that demand had been made for the repayment of sums aggregating $234,104.12 for petroleum which the defendants were unable to deliver, and the demand was repeated.

In December, 1918, the plaintiffs made a written contract with a corporation called the Boston Mexican Leasing Company (hereinafter called the Leasing Company) for the sale and delivery of petroleum produced from the Harmon well at Panuco, Mexico, in quantities not less than one hundred and fifty thousand barrels nor more than three hundred and thirty thousand barrels a month for five years from July 1, 1919, with the right on the part of the plaintiffs to call for certain quantities of oil in April, May and June, 1919. The well was represented by the Leasing Company to have a proved production of about fifty thousand barrels a day. The oil was to be delivered, on barges at the terminals to be constructed and provided by the Leasing Company near the well on the Panuco River, at the Leasing Company's "expense, risk and peril," title to the petroleum was to pass to the plaintiffs upon such delivery and payment for each month's deliveries was to be made by the twentieth of the month following. The contract was to bind and inure to the benefit of the parties and their assigns. In April, 1919, the plaintiffs assigned their interest in the contract to the Foreign Development Company, and two days later that company assigned this interest to the Canada Mexico Oil Company, Ltd. (hereinafter called the Canada Company).

These assignments covered contracts with other parties and provided that, when contracts could not be so assigned as to give the purchaser all rights and interest of the vendors, the plaintiffs would hold all such rights and interest in trust for the benefit of the purchaser and its transferees or assigns, and enforce the same for their benefit in such manner as they might direct.

The suit is brought by the plaintiffs in their own behalf and in behalf of and as trustees for the Canada Company whose counsel appeared at the trial and stated that the suit was brought with the approval of that company which was prepared to become a party plaintiff if necessary. The second contract provided that a corporation might be substituted for the plaintiffs with the written consent of the defendants.

Before any oil was delivered a reorganization and consolidation of the Leasing Company and other corporations associated with it took place and the assets of the Leasing Company, including the contract for the sale of oil, were assigned to the defendants. The assignment was made with the approval of the plaintiffs. Certificates were issued to the shareholders of the consolidated companies, among whom were the plaintiffs, who held shares in the Leasing Company and thus became shareholders in the trust. One of the plaintiffs, Harper, became one of the trustees and continued as such until he resigned, November 5, 1920.

The defendants were ready to make deliveries July 1, 1919. The plaintiffs paid for the minimum amount of oil which was to be taken in July and August, but took less than that amount. In September, 1919, the parties agreed that the plaintiffs were to have the right to defer the taking of one million barrels of oil and to take that oil as called for at later periods, in addition to the current requirements of the contract, provided the postponed oil be paid for at the times originally fixed for its delivery.

In November, 1919, in a new contract between the plaintiffs and the defendants for an additional amount of oil during the five years covered by the first contract and for the delivery of oil during the succeeding five years, the state-

ments in the previous agreement, as to the proved production of the Harmon well of fifty thousand barrels a day, and the provision with respect to delivery free on board barges at the "expense, risk and peril" of the defendants, title to pass on such delivery, were substantially repeated. No reference was made in this contract to the assignment of the plaintiffs' rights under the contract with the Leasing Company. The agreements provided that they were to be construed and governed by the laws of Massachusetts.

In the early part of 1920 the price of oil rose, and in July, 1920, the parties modified their contracts by providing that after January 1, 1921, there should be no maximum and minimum quantities to be delivered but a definite monthly amount, and increasing the aggregate amount of deliveries which the plaintiffs were entitled to postpone during the first five years of the contract.

Shortly after the third contract was made, salt water began to appear in the Panuco oil field in various wells which had previously been good producers. The appearance of such water in a well is a sign that the supply of oil is approaching exhaustion, and the appearance of sediment indicates a like condition.

On August 19, 1920, the plaintiffs gave the defendants notice that they desired to take the maximum quantity as set forth in the last modification of the contract, and also wrote, "We have at the present time approximately 1,600,000 barrels of back oil paid for but not taken and desire to take this up at the rate of 100,000 to 150,000 barrels per month." The trustees were bound under their contract to deliver the back oil as and when they were requested in writing so to do by the plaintiffs, subject to the provision that they were not required to make such deliveries "in such manner or at such times as . . . [should] interfere with the performance of other contracts for the sale of petroleum which . . . [might] have then been entered into." The defendants had then made other contracts for the sale of oil from the Harmon well, which, with the plaintiffs' orders, would take about twenty-nine thousand eight hundred barrels a day for current requirements.

On August 24, 1920, the defendants, in their reply to the plaintiffs' letter, stated that it did not seem wise to run the well at a greater rate than twenty-five thousand or twenty-six thousand barrels a day.   The plaintiffs did not then make formal demand for back oil, in accordance with the terms of the contract, but arranged with the defendants about September 10, 1920, to be personally informed by the defendants' agent from time to time whenever oil might be available for delivery on account of this back oil.

On September 21, 1920, the defendants received a telegram from their local agent in Panuco stating that the production of the Harmon well had been reduced to ten thousand barrels daily on account of sediment showing in the flow.   This reduction was made September 11, and the trial judge found that the sediment must have made its appearance before that date.   The defendants immediately wrote the Canada Company giving notice of the reduction and, on September 27, 1920, wrote the plaintiffs that they had been notified that it had become "necessary to reduce the production of the well to 10,000 barrels a day."   It did not appear that any notice of the appearance of sediment was given to the plaintiffs or to the Canada Company before September 21, 1920.

The flow of oil from the Harmon well after September 11 diminished through September and October, and on November 30, 1920, the trustees notified the Canada Company that their agent telegraphed them that the Harmon well had been "shut down indefinitely."   The well has not since the latter date been operated by the defendants or the Leasing Company.   On January 23, 1922, the defendants sold their interest in the well and the entire plant in Panuco. The plaintiffs received in all one million one hundred sixty-three thousand three hundred and fifteen barrels of oil which at the contract price would amount to $168,680.70.   They paid under the contracts $383,866.19.   The difference between these sums, $215,185.49, represents the contract price for one million four hundred eighty-four thousand and thirty-seven and seventy-three hundredths barrels of oil

and the plaintiffs seek to recover in this suit the money paid for this oil not delivered.

The defendants contend that if any one has the right to maintain this suit it is the Canada Company and not the plaintiffs.

After the defendants had succeeded to the rights of the Leasing Company, the only contracting parties were the plaintiffs and defendants, and all payments were made when they alone were bound by the contractual obligations. The defendants knew of the assignment to the Canada Company but never gave the consent which was required by the contract to make an assignee a party to it. Upon the facts appearing of record, we cannot say that the finding that payments for oil were made by the plaintiffs was not justified. The assignment to the Canada Company, the delivery of oil to it, and the fact that some payments were made by checks of the Canada Company, when considered with all of the other facts do not require this court as a matter of law to say that the conclusion that the plaintiffs may maintain this suit was wrong. We are not now concerned with the question whether the Canada Company may require an accounting from the plaintiffs. This suit is not for breach of contract but the obligations of the contracts at the time when the money was paid may be considered. In legal effect, while the contracts were in force the deliveries were to the plaintiffs and payments were made by them. Their arrangements with other parties did not affect the defendants' rights. The plaintiffs alone could require deliveries. The defendants are fully protected by the record from liability to the Canada Company in another proceeding upon the matters now in issue.

The contracts were made upon the express representation that the well had a proved capacity of fifty thousand barrels of petroleum a day, and the first contract for five years was within a year extended for a further period of five years. The later contracts increased the quantity of oil to be sold from the well, and all of them were for definite quantities of oil at fixed prices. When the first contract was made there was no way of getting oil from the well to the barges.

Terminals were to be built. The provision in paragraph 10 of the first contract, exempting each party from loss, cost or damages connected with delay or failure in performance due to various designated causes or "any other cause over which the party in default shall have no control," does not refer to exhaustion of the well. It applies to both parties and provides only for a suspension of the obligation to perform during the continuance of the disability, but not longer, and it contemplates causes which may be overcome or removed, and provides for resumption of performance as soon as the cause of suspension is removed, giving the party not in default the right to terminate the agreement if the suspension continues for thirty consecutive days. In paragraph 11, the Leasing Company was protecting itself from liability if unable to deliver oil according to the terms of the contract, because of a claim or suit therein referred to, or "by reason of the failure of the Harmon Well from any cause whatsoever to produce petroleum sufficient to enable it to make said deliveries." The Leasing Company was required within six days after the happening of such event to notify the plaintiffs of its inability to deliver, of the cause and probable duration thereof, and thereupon the Leasing Company would not be liable to the plaintiffs for any loss incurred by the failure of the trustees to deliver petroleum at the times and in the manner required by the agreement. The plaintiffs were given the right upon receipt of such notice to terminate the agreement forthwith or to suspend it "until such time as the Leasing Company . . . [might] be able to continue deliveries of petroleum hereunder," and the plaintiffs upon receipt of the notice were required to "notify the Leasing Company with reasonable dispatch as to what action they intend[ed] to take." The Leasing Company was also required to notify the plaintiffs as soon as it was able to resume deliveries, and the plaintiffs within ten days were to notify the Leasing Company whether they would accept deliveries or finally terminate the contract.

In the next agreement, made between the plaintiffs and the defendants, paragraphs 13 and 14 are substantially identical with paragraphs 10 and 11 of the earlier one, except

for the fact that the defendants and not the Leasing Company are named as contracting parties.

Paragraph 11 of the first agreement and paragraph 14 of the second provide in effect that if the well should fail and the defendants should not therefore be able to meet their contract obligations, then upon giving notice they should be excused from these obligations and should not be answerable in damages because of their inability to deliver oil. But the contracts do not provide in these sections or elsewhere that the defendants should not be bound to return money paid in advance for oil which they were excused from delivering. The contracts did not impose upon the plaintiffs the risk of losing the payments if the postponed oil could not be delivered because of exhaustion of the well. The obligation to return these payments is created by the law and not by the contract.

The prevailing rule in Massachusetts seems to be that, when the contract is terminated because performance has become impossible, a party who has made payments under it for which no consideration has been given may recover them if there is no provision in the contract precluding such recovery; and, if a party has furnished materials or rendered services or delivered goods the law creates a liability to pay their value "to be determined by the price stipulated in the contract, or in some other way if the contract price cannot be made applicable." *Butterfield* v. *Byron*, 153 Mass. 517, 523. See *Willington* v. *West Boylston*, 4 Pick. 101, 103; *Thompson* v. *Gould*, 20 Pick. 134; *Harrison* v. *Conlan*, 10 Allen, 85, 86, 87; *Johnson* v. *Walker*, 155 Mass. 253; *Angus* v. *Scully*, 176 Mass. 357, 358; *Young* v. *Chicopee*, 186 Mass. 518, 520; *Hawkes* v. *Kehoe*, 193 Mass. 419, 423, 425; *Tucker* v. *Boston*, 223 Mass. 478, 481; *Libman* v. *Levenson*, 236 Mass. 221. In the case at bar the contract price for oil delivered can be made applicable and no sufficient reason appears for applying any other standard.

In *Vickery* v. *Ritchie*, 202 Mass. 247, it was decided that the parties never made a contract. And in *Putnam* v. *Bolster*, 216 Mass. 367, the contract price could not be made applicable.

The contention of the defendants that the plaintiffs are not

entitled to recover because they made payments for petroleum not delivered, "as if deliveries had been accepted in accordance with the terms of Clause 1 hereof," cannot be sustained. The findings by the trial judge in regard to these payments were justified by the evidence. It is clear from a reading of all the provisions relating to postponed deliveries that the plaintiffs in making each payment were paying for the oil delivered during the previous months, and that any balance remaining was a payment in advance for oil to be delivered; that the defendants bound themselves to make deliveries of such oil; and that the provisions of the contracts, that the title to the oil was to pass upon delivery on barges at the defendants' terminals, applied to this oil, the delivery of which was postponed. It appears that the pool which supplied oil to the Harmon well fed at least two other wells in the immediate vicinity owned by other companies, and the oil drawn from these wells during the period of the plaintiffs' contracts decreased the supply available for the Harmon well. It did not appear that the parties knew that drafts from other wells were reducing the supply from the Harmon well. But, if it be assumed that the finding of facts means that, if the plaintiffs had taken the full amounts to which they were entitled under their contracts they would have received all oil for which they paid before the well was exhausted, still it cannot be held that the undelivered oil was at their risk during this period and that in delaying the deliveries, in accordance with the provisions of the modifying contracts, the plaintiffs were at fault. The title to the oil was to pass upon delivery to barges at the defendants' terminals. The plaintiffs took no risks as to oil not delivered. See G. L. c. 106, § 24. To make the buyer responsible for goods before delivery, it must appear that delivery was delayed through his fault. No fault can be attached to delayed deliveries if the parties have contracted that they may be made. Fault means wrongful act or default. G. L. c. 106, § 65.

The words, "as if deliveries had been accepted," were intended to fix the times and amounts of the payments to be made as set forth in clause 1 of the contract. They did not

give the defendants the right to retain the money paid for oil in reliance upon the defendants' promise to deliver it in the future when it appears that the future deliveries were not made and could not be made bècause of exhaustion of the well. The consideration for the payments for oil not delivered was the defendants' obligation to deliver this oil in the future at the plaintiffs' request, and the fact that these payments were for uncaptured oil in the defendants' well and that other wells were exhausting the supply does not affect the plaintiffs' right to recover.

The defendants also contend that rescission is necessary to recovery and that there has been no rescission. On November 30, 1920, the defendants gave notice that the Harmon well had been shut down indefinitely. The plaintiffs, in December, 1920, made demand for return of the money paid for oil not delivered. They pressed this claim before the arbitrator, and on May 20, 1922, before this suit was begun, they gave the notice hereinbefore quoted. This notice was sufficient to terminate the contract if notice for that purpose were required. The notice which by the terms of the contracts the plaintiffs were to give if they decided to terminate or suspend them was dependent upon receipt of a notice from the defendants within a specified time giving the cause and probable duration of their inability to deliver petroleum. The notice sent by the defendants did not comply with these requirements. In *Johnson* v. *Walker,* *supra,* page 255, the court said in regard to a contract for personal services of the plaintiff: "The right of the defendants to terminate the contract did not depend on giving notice to the plaintiff, but on the fact that he had become unable to render the services on whose continuance the contract depended." See *Butler* v. *Gleason,* 214 Mass. 248; *Butterfield* v. *Byron,* 153 Mass. 517, 519, 520. In the case at bar it had become impossible for the defendants to fulfil their contract because of exhaustion of the well, and notice from the plaintiffs that they would terminate the contract would not affect the rights of either party.

The plaintiffs have not lost their right to maintain this suit by presenting claims under the contracts to the arbitrator.

No sufficient reason appears in the finding of facts for deducting from the amount payable to the plaintiffs the sums represented by payments made by the defendants of commissions or royalties or of profits paid shareholders other than the plaintiffs. As to the part of the profits paid the plaintiffs as shareholders, the defendants may recover from them the sum, if any, that is properly chargeable to the money received from the plaintiffs for oil not delivered. The issue, whether the trustees are personally liable for any sum in excess of the trust property, was expressly stated in the decree to be left undecided, and we do not pass upon it in this opinion. All questions argued have been considered.

The interlocutory decree is to be modified by declaring that the contracts are terminated and that in so far as payments have been made thereunder at the contract price for oil delivered there is to be no further accounting, and ordering that the plaintiffs recover from the defendants the amounts paid for oil not delivered after deducting such sum, if any, as may be shown to have been paid the plaintiffs as shareholders with money received for oil not delivered. The decree is further to provide that the question whether the defendants are personally liable for any sum in excess of the trust property is left undecided, and that the case is to stand for further hearing.

*Ordered accordingly.*