HARRY N. BAETJER & others, trustees, *vs.* NEW ENGLAND ALCOHOL COMPANY.

Suffolk. January 10, 1946. — May 16, 1946.

Present: FIELD, C.J., QUA, DOLAN, & RONAN, JJ.

*Sale,* Contract of sale. *Contract,* Construction, Performance and breach. *Words,* "Delivery."

A provision of a contract in writing for sale of a stated quantity of molasses to be loaded on the buyer's vessel at a Puerto Rican port, that the buyer should not be liable for failure to take delivery "for any of" several "causes," including war, and the fact that the state of war in 1942 prevented the buyer from obtaining any vessel to transport the molasses, did not excuse the buyer from making payment on August 31, 1942, for molasses unshipped on that date, where earlier clauses of the contract provided that the buyer would take delivery during the year 1942 in not more than five parcels, the molasses loaded to be at his risk from the time it passed over the rail of his vessel "except where earlier date is herein fixed for transfer of risk"; that the molasses should be free of storage until shipped; that the seller would deliver aboard the buyer's vessel, barges "to effect delivery to . . . vessels" to be provided by the seller; that on or before August 31, 1942, the buyer would "accept delivery in tanks of the seller [at a port in Puerto Rico] of all" unshipped molasses, for which he would make payment on that date; and that upon "such payment, title shall pass to the buyer and thereafter such molasses shall be at the risk of the buyer," although the seller during 1942 should continue to store it and deliver it to the buyer's vessel.

Federal general imports order M–63, paragraph (b), as amended, prohibiting any person other than certain Federal agencies, except as authorized by the director of industry operations, from purchasing for import, importing, or receiving for import or making "any contract or other arrangement for importing of" molasses, did not excuse a buyer from making payment under the terms of a contract of sale of Puerto Rican molasses requiring the buyer to "accept delivery in tanks of the seller" at a port in Puerto Rico and to make payment on August 31, 1942, even though it was the buyer's intention to receive it for import, where it did not appear that the buyer could not obtain authority for importation from the director of industry operations, and the contract did not require the buyer to import.

That the buyer under a contract in writing for the sale of molasses made in April, 1942, requiring his taking title on August 31, 1942, in tanks of the seller in Puerto Rico and providing for delivery by the seller in the seller's barges onto vessels to be furnished by the buyer, was unable by reason of Federal orders and the state of war to procure vessels to receive delivery, did not excuse him from making a stipulated payment on August 31, 1942, on the ground that the undertakings of the parties were expressly or impliedly conditioned in a contractual sense upon the continuance of availability of shipping facilities or that they were entered into upon the mutual assumption of such continuance, where the attendant facts not only did not show such ground but showed the contrary.

CONTRACT.   Writ in the Superior Court dated October 15, 1942.

The action was reported by *Hurley, J.*

*R. G. Dodge*, (*T. M. Banks, Jr., & A. W. Scott, Jr.,* with him,) for the plaintiffs.

*E. O. Proctor*, (*J. W. Bryant* with him,) for the defendant.

QUA, J.   This action was originally brought to recover the sum of $259,473.19 alleged to have become due and payable by the defendant [1] to the plaintiffs on August 31, 1942, on account for a balance of two million fifty-nine thousand three hundred eleven gallons of Puerto Rican molasses out of a total amount of two million five hundred thousand gallons which the plaintiffs had agreed to sell and the defendant had agreed to buy under a contract in writing entered into between the parties on April 3 of that year. Early in 1944 the molasses in question was sold in accordance with a stipulation of the parties for the same price as that called for by the contract, so that the question now is whether the defendant is liable for interest for not having paid the sum alleged to have become due to the plaintiffs on August 31, 1942.   The Superior Court reported the case upon a case stated without making any decision.   G. L. (Ter. Ed.) c. 231, § 111.

The plaintiffs have a place of business at Caguas in Puerto Rico.   The defendant produces industrial ethyl alcohol at

---

[1] The writ runs against "New England Alcohol Company, a voluntary association under a written instrument or declaration of trust, the beneficial interest under which is divided into transferable certificates of participation or shares."   The action runs against the trust under G. L. (Ter. Ed.) c. 182, § 6, as if it were a corporation.

its plant in Everett in this Commonwealth and has required as raw material great quantities of molasses. Negotiations between the parties began in January, 1942. The plaintiffs knew throughout that the defendant was manufacturing alcohol at Everett. The contract as finally agreed upon fixed a price "f. o. b. Buyer's vessel" at the port of Humacao, Puerto Rico.

Under the head of "Withdrawals" the contract provided that the buyer (defendant) would take delivery of "the molasses sold hereunder" during the year 1942 in not exceeding five parcels and would give the seller (plaintiffs) at least ten days' notice of the anticipated arrival of each tanker and of the amount to be loaded thereon by the seller. The molasses loaded was to be at the buyer's risk from the time it passed over the rail of the buyer's vessel, "except where earlier date is herein fixed for transfer of risk" — a reference, doubtless, to the proposed delivery in the seller's tanks on August 31, 1942, hereinafter mentioned.

Under the head of "Pro Forma Payment" the contract provided that for each shipment prior to August 31, the buyer would make an initial payment of ninety per cent of the seller's "pro forma invoice" upon presentation of the invoice and bill of lading indorsed to the buyer's order at a designated bank in San Juan. (It was provided elsewhere in the contract that the amount of the final payment for each shipment was to be determined, after analysis of the molasses by a method of calculation elaborately described.) Under the head of "Pro Forma Payment" is also found this important provision, "The Buyer will on or before August 31, 1942, accept delivery in tanks of the seller [meaning in Puerto Rico] of all molasses covered by this Contract remaining unshipped." Payment on account of "such undelivered molasses" was to be made on said August 31, 1942, to the seller by the buyer at the bank in San Juan of ninety per cent of the amount of the seller's "pro forma invoice." "Upon such payment, title shall pass to the Buyer and thereafter such molasses shall be at the risk of the Buyer, but the obligation of the Seller to continue to store during the remainder of the year 1942 and to deliver to Buyer's

vessel, as provided under the withdrawals clause, and the right of the Seller to collect the balance of the purchase price shall continue."

Under the head of "Storage" it was provided that the molasses would be free of storage until shipped.

Under the head of "Delivery" it was provided that the seller would deliver aboard the buyer's vessel at safe anchorage in Humacao Harbor, and it was elsewhere stipulated that the barges "to effect delivery to tank vessels" should be provided by the seller.

The contract contained a clause headed "Force Majeure" and reading as follows: "Seller will not be liable for any delay in delivery, or failure to deliver, any or all of the aforesaid molasses in case such delay in delivery, or failure to deliver, is caused by labor troubles, strikes, lockouts, war, riots, insurrection, civil commotion, failure of crops or supplies from ordinary sources, fire, flood, storm, accident or any Act of God, or other cause beyond Seller's control. In like manner Buyer shall not be liable for failure to take delivery of the molasses purchased hereunder for any of the above causes which would prevent Buyer's vessel from accepting delivery. But, in any such case, the party claiming the benefit of this article shall use due diligence to remove any such causes, and resume performance hereunder as soon as possible, performance by other party being suspended and excused meanwhile."

On April 3, 1942, the defendant took delivery at Humacao and later paid for four hundred forty thousand six hundred eighty-nine gallons. The tanker upon which this molasses was loaded was sunk by a submarine the next day. This was the only molasses ever delivered under the contract. The reasons which prevented the defendant from sending other tankers to take delivery are set forth in the case stated as follows: "For a long period of time beginning in January, 1942, the defendant made every reasonable effort to arrange for shipments of molasses covered by its contract with the plaintiffs, but on account of war conditions, including the shortage of tankers and destruction by enemy submarines, it was unable to arrange for any

shipment except the one on April 3, 1942, above referred to. The defendant applied to the proper officials and government agencies including the War Production Board and the War Shipping Administration for means to transport the molasses in question from Puerto Rico, but was unable to obtain authorization. Defendant at all times acted with due diligence in an effort to secure means of removing the molasses, but was unable to do so through no fault of its own. It was not until the latter part of 1943 that it became possible to ship molasses from Puerto Rico in substantial quantities." It further appeared that foreign shipping was not available, and that the difficulties with shipping communication in 1942 were not confined to Puerto Rico but covered the Atlantic Ocean generally.

When August 31 arrived the plaintiffs presented at the bank in San Juan the "pro forma invoice" required by the contract for the two million fifty-nine thousand three hundred eleven gallons not yet delivered and demanded payment of ninety per cent of the amount thereof, or $259,473.19, which sum the defendant refused to pay. Thereafter the plaintiffs held in their tanks the two million fifty-nine thousand three hundred eleven gallons for the account of the defendant until this molasses was sold by agreement of the parties as hereinbefore stated.

The defendant contends, among other things, that the "Force Majeure" clause is a defence to the action. It construes that clause as referring to the "delivery" on August 31 into tanks of the seller of "all molasses covered by this contract remaining unshipped" and as excusing the buyer from taking and paying for such "delivery" on August 31, if any of the casualties mentioned in the "Force Majeure" clause had up to that time prevented its vessel from accepting delivery. It argues that this is the literal meaning of the clause; that shipment and not storage was of the essence of the contract; and that any other construction would result in the defendant receiving practically no protection from the clause, although, as the defendant argues, it afforded substantial protection to the plaintiffs.

There is force in the argument, but after careful study of

the contract we are unable to accept the contention. It is necessary to construe the "Force Majeure" clause with reference to the previous clauses of the contract. Under the "Withdrawals" clause the buyer was to "take delivery of the molasses sold hereunder during the calendar year 1942 in not exceeding five parcels." The buyer had the entire year 1942 in which to take delivery, including that part of the year remaining after the so called "delivery" of August 31 into tanks of the seller. Therefore the word "delivery" in the "Withdrawals" clause quite plainly includes the loading on the buyer's vessel of the same molasses which for the purposes of passing title and payment was to have been previously delivered into tanks of the seller on August 31. So also the last sentence of the clause providing for the August 31 "delivery" speaks of the obligation of the seller even after that date "to deliver to Buyer's vessel." Thus it seems that delivery is understood in two senses in the contract. Except in the first sentence of the clause relating to the technical "delivery in tanks of the Seller" on August 31, it means primarily, if not exclusively, the actual loading of molasses upon the buyer's vessel. We think it was used in this sense in the "Force Majeure" clause wherein it was provided that the buyer "shall not be liable for failure to take delivery of the molasses purchased hereunder for any of the above causes [war, and so forth] which would prevent Buyer's vessel from accepting delivery." We think that the "delivery" for failure to take which the buyer was to be excused was delivery into the buyer's vessel and not delivery into the seller's tanks. It is difficult to correlate prevention from accepting delivery in the buyer's vessel with failure to take delivery in the seller's tanks of all molasses "remaining unshipped" on a specified day. It is also difficult to fit the temporary character of the relief given by the "Force Majeure" clause to an excuse for not paying an ascertainable sum on a fixed day. Would the duty of the buyer to "resume performance . . . as soon as possible" by the use of "due diligence" require it to make the full payment that would have been due on August 31 as soon as some vessel could be obtained capable of "accept-

ing delivery" on one occasion, or would it be required to pay only for each shipment as fast as it could get vessels, thereby in effect wholly and permanently depriving the seller of the benefit of the lump sum payment agreed upon?

Our construction of the "Force Majeure" clause does not render that clause worthless to the defendant. It would still effectually relieve the defendant from liability for failure to take the molasses in its vessels during the calendar year 1942 and thereafter at least as long as and to the extent that, notwithstanding due diligence on its part, the excuse continued. This may well have been the extent of the protection intended to be given to the defendant. Indeed, the provision for acceptance in tanks of the seller and for payment for the molasses remaining unshipped on August 31, which seems to be superimposed upon the other terms of the contract, may well have been inserted because of doubt whether in time of war available shipping would permit of removal of the molasses in accordance with the contract and for the sole purpose of protecting the seller against unreasonable delay in payment if shipping could not be found.

The defendant next contends that it was forbidden to accept delivery in tanks of the seller on August 31, and therefore that it was excused from making the payment due on that day, by "General Imports Order M-63" of the War Production Board, as amended June 2, 1942 (7 Fed. Reg. 4198). As amended, paragraph "(b)" of this order entitled "Restrictions on imports of materials," including "imports" from Puerto Rico to continental United States (see definitions, 6 Fed. Reg. 6796, 7 Fed. Reg. 4878), provided that no person other than certain Federal agencies, except as authorized by the director of industry operations, should "purchase for import, import, offer to purchase for import, receive, or offer to receive on consignment for import, or make any contract or other arrangement for the importing of" certain materials, including molasses (amendment of June 30, 1942, effective July 2, 1942, 7 Fed. Reg. 4878, 4880).

If this order can be stretched to forbid the mere receipt

in tanks in Puerto Rico and payment for the molasses to be accepted and paid for on August 31, 1942, there is nevertheless nothing in the case stated to show that the defendant could not obtain authorization by the director of industry operations to receive and pay for the molasses in Puerto Rico on that day or that the defendant made any attempt to obtain such authorization.    Moreover, the contract between the plaintiffs and the defendant did not require the defendant to receive the molasses for import, although such was undoubtedly the defendant's intention.    So far as the contract went the defendant could have received the molasses for resale to the government or to some other person or for some other purpose.    *Cooper* v. *Mundial Trading Co. Inc.* 105 Misc. (N. Y.) 58, affirmed, 188 App. Div. (N. Y.) 919.    For these reasons there was nothing in "General Imports Order M-63" that prevented the defendant from making payment according to its contract on August 31, 1942.

The defendant's last contention is based upon the theory that performance of a contract may be excused if the parties contract on the assumption of the continued existence of something essential to performance and that thing fortuitously ceases to exist.    *Baylies* v. *Fettyplace*, 7 Mass. 325.    *Gilbert & Barker Manuf. Co.* v. *Butler*, 146 Mass. 82. *Butterfield* v. *Byron*, 153 Mass. 517.    *Angus* v. *Scully*, 176 Mass. 357.    *Young* v. *Chicopee*, 186 Mass. 518, 520.    *Hawkes* v. *Kehoe*, 193 Mass. 419.    *Browne* v. *Fairhall*, 213 Mass. 290.    *Amiro* v. *Crowley*, 256 Mass. 53.    *Cochrane* v. *Forbes*, 257 Mass. 135.    *Texas Co.* v. *Hogarth Shipping Co. Ltd.* 256 U. S. 619.    *F. A. Tamplin Steamship Co. Ltd.* v. *Anglo-Mexican Petroleum Products Co. Ltd.* [1916] 2 A. C. 397. Compare *Moreland* v. *Credit Guide Publishing Co. Inc.* 255 Mass. 469.    It is contended that this principle covers the means of performance as well as the subject matter of the contract itself, and therefore that when it became impossible to obtain shipping the defendant was excused. *Israel* v. *Luckenbach Steamship Co. Inc.* 6 Fed. (2d) 996, 997, certiorari denied, 268 U. S. 691.    *H. Hackfeld & Co. Ltd.* v. *Castle*, 186 Cal. 53.

We think it unnecessary in this case to consider at length the scope of this principle or whether it can properly be applied to relieve from such a breach as a mere refusal to accept and pay for existing merchandise, acceptance of which according to the terms of the contract remains possible. It is plain that before the principle can be invoked it must appear that there was either a mutual agreement upon which the promises of the parties were dependent that a certain means of performance should continue to exist or perhaps at the very least a mutual assumption of such continuance of existence as the basis on which the parties contracted. Under the latter alternative "The inquiry is merely this, whether the continuance of a special group of circumstances appears from the terms of the contract, interpreted in the setting of the occasion, to have been a tacit or implied presupposition in the minds of the contracting parties, conditioning their belief in a continuing obligation." Cardozo, C. J., in *Canadian Industrial Alcohol Co. Ltd.* v. *Dunbar Molasses Co.* 258 N. Y. 194, 198, quoted in Williston on Contracts (Rev. ed.) § 1952, at pages 5472–5473. *The Kronprinzessin Cecilie,* 244 U. S. 12, 24. Am. Law Inst. Restatement: Contracts, §§ 460, 461, 288.

At this point the defence fails. The case stated does not show either that the undertakings of the parties were expressly or impliedly conditioned in a contractual sense upon the continuance of shipping facilities or that they were entered into upon the mutual assumption of such continuance, conditioning the belief of the parties in a continuing obligation. In our opinion the case shows the contrary. When the contract was entered into on April 3, 1942, this country had been formally at war for approximately four months. The statutes of the United States had for some time contained general provisions for government requisition of vessels during a national emergency declared by the President. Act of June 29, 1936, U. S. C. (1940 ed.) Title 46, § 1242. Act of June 6, 1941, U. S. C. (1940 ed.) Sup. IV, Title 50, Appendix, § 1271. On September 8, 1939, the President had proclaimed a limited national emergency (4 Fed. Reg. 3851), and on May 27, 1941, he had pro-

claimed an unlimited national emergency (6 Fed. Reg. 2617). It appears that in January, February, and March, 1942, attacks on vessels in the Caribbean and nearby Atlantic areas, although comparatively few at first, were doubling each month, and insurance rates were rising rapidly. As early as the latter part of January the corporation from which the defendant had been accustomed to obtain its tankers had obligated itself to employ its ships only for Defence Supplies Corporation, although it agreed with the defendant "to coöperate in every way possible" to secure a tanker for the defendant. By Executive Order No. 9054 of February 7, 1942 (7 Fed. Reg. 837), the War Shipping Administration was established and given final authority to control the use of all ocean merchant vessels under the flag or control of the United States except those under the control of the director of the Office of Defence Transportation. Foreign vessels could carry freight from Puerto Rico to continental United States only under Federal authority. Merchant Marine Act of 1920, U. S. C. (1940 ed.) Title 46, § 883. See 7 Fed. Reg. 2581. In the light of these facts and other facts existing as of common knowledge in the first quarter of 1942 it is impossible to believe that these parties, engaged in commercial business involving sea transportation in the Caribbean, contracted upon an implied agreement or even a tacit "presupposition" that shipping communications would remain uninterrupted. On the contrary, as already stated, they expressly provided in their contract for interruption caused by war and agreed that such interruption should furnish a temporary excuse, though not, as we think, for the breach that occurred. When the defendant contracted to take the molasses in its vessels it doubtless hoped for and may have expected the best, but it also knew the worst and, except for the limited protection of the "Force Majeure" clause, took the risk. *Rowe* v. *Peabody,* 207 Mass. 226, 232–234. *Gaston* v. *Gordon,* 208 Mass. 265. *John Soley & Sons, Inc.* v. *Jones,* 208 Mass. 561, 567–568. *Beacon Tool & Machinery Co.* v. *National Products Manuf. Co.* 252 Mass. 88. *Lloyd* v. *Murphy,* 25 Cal. (2d) 48. *Northern Pacific Railway* v.

*American Trading Co.* 195 U. S. 439, 465. *Madeirense Do Brasil S/A* v. *Stulman-Emrick Lumber Co.* 147 Fed. (2d) 399, 403, certiorari denied, 325 U. S. 861. See *Pottash* v. *Herman Reach & Co. Inc.* 272 Fed. 658.

Even if we were to go beyond the alleged defence of impossibility of performance on the part of the defendant, and were to consider the case with reference to the modern doctrine of so called "frustration,"[1] a doctrine little discussed as yet in this Commonwealth, the result would be the same. Whatever may be the extent and validity of that doctrine, and apart from any other reasons for not applying it in this case, a contracting party cannot be excused where the only "frustration" consists in the fact that known risks assumed by him have turned out to his disadvantage. *Lloyd* v. *Murphy,* 25 Cal. (2d) 48, 55. *Allanwilde Transport Corp.* v. *Vacuum Oil Co.* 248 U. S. 377, 385. See *Imbeschied* v. *Lerner,* 241 Mass. 199, 201.

The result is that the defendant was not excused from making payment on August 31, 1942, for the two million fifty-nine thousand three hundred eleven gallons of molasses delivered in the plaintiffs' tanks and is liable for the interest on the sum which should have been paid. Under stipulations contained in the case stated the amount recoverable is $28,946.78 plus interest at six per cent from October 12, 1945, on the principal sum of $26,679.11. Judgment is to be entered for the plaintiffs accordingly.

*So ordered.*

---

[1] This doctrine is explained in Williston on Contracts (Rev. ed.) § 1954. See *Krell* v. *Henry,* [1903] 2 K. B. 740; *The Claveresk,* 264 Fed. 276, 282–284; *Field* v. *Woodmancy,* 10 Cush. 427.