CHASE PRECAST CORPORATION vs. JOHN J. PAONESSA
COMPANY, INC. & another;[1] COMMONWEALTH, third-party
defendant.

No. 88-P-734.

Worcester. April 10, 1989. - June 1, 1990.

Present: ARMSTRONG, KAPLAN, & DREBEN, JJ.

Further appellate review granted, 408 Mass. 1101 (1990).

Contract, Performance and breach, Subcontract, Incorporation by refer-
ence, Public works, With Commonwealth. Commonwealth, Contracts.

In a civil action for damages resulting from the modification of a State
public works contract the judge correctly ruled that the subcontracts in
question were not made subject to the conditions in the general contract
that allowed the Commonwealth broad power to modify the contract
with limited or no liability. [641-643]
In a civil action for damages resulting from the Commonwealth's unilat-
eral cancellation of a portion of a public works contract, the judge cor-
rectly ruled that the contractor and subcontractor on that portion were
excused from further performance under the doctrine of frustration of
purpose; and where the subcontractor had been paid for all the work it
had performed it was not entitled to any loss of profits for work antici-
pated but not performed. [643-646]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 25, 1986.

The case was heard by Gerald F. O'Neill, Jr., J.

David A. Talman for the plaintiff.

John J. Spignesi for John J. Paonessa Co., Inc.

Gerald K. Kelley, Assistant Attorney General, for the
Commonwealth.

ARMSTRONG, J. The plaintiff (Chase), a producer of pre-
cast concrete products, appeals from a judgment dismissing
its action for damages that resulted from cancellation of its
contract to supply median barriers in a road reconstruction

---

[1]John J. Paonessa.

project. The circumstances were these. The Commonwealth, acting through its Department of Public Works (D.P.W.), in the summer of 1982 entered into two contracts with John J. Paonessa Company, Inc. (Paonessa), for resurfacing and improvements for two stretches of Route 128 in Gloucester, Manchester, and Essex. Part of each contract called for rebuilding the median strip between the north and southbound lanes. A grass strip was to be replaced with bituminous concrete surfacing and permanent precast, double-face, concrete median barrier. Paonessa entered into two contracts with Chase to supply (in the aggregate) 25,800 linear feet of double-face median barrier to the specifications required for D.P.W. highway construction.

The road rebuilding began in the spring of 1983. By late May the D.P.W. was receiving protests from angry residents whose concerns were environmental and aesthetic. A resident group (numbering about one hundred) engaged counsel and on June 6 filed an action in the Superior Court to stop installation of the concrete median barrier and some other aspects of the work. So far as appears no injunctive order was granted; but on June 17, the D.P.W. and the residents' group entered into a settlement which provided, in part, that no additional concrete median barrier would be installed. On June 23 the D.P.W. finally deleted the permanent concrete median barrier item from the Paonessa contracts.

Paonessa had learned of the protest by residents around June 1. Anticipating modification by the D.P.W., it notified Chase by letter dated June 7 to stop producing concrete median barrier for the projects. Chase did so on receipt of the letter the following day. At that point Chase had produced approximately half of the concrete median barrier (in ten-foot segments) called for by its contracts with Paonessa, and had delivered most of it to the construction sites. For all that it had produced, Chase was paid by Paonessa at the contract unit price, $14.50 per linear foot.

Chase brought this action to recover its anticipated, lost profit on the median barrier called for by its supply contracts with Paonessa but not produced. The judge found the lost

profit to be $64,291.[2] Neither this finding nor the general proposition that Chase should be entitled to recover its lost profit from Paonessa if the latter is in breach is contested in this appeal.

Paonessa, named as the defendant in Chase's action, brought its own cross action against the Commonwealth for indemnification in the event it should be held liable to Chase.

## 1. *Incorporation of the General Contract Conditions in the Supply Contract.*

Paonessa argues that it is in a position analogous to that of a stake holder: if the D.P.W. was entitled under the conditions of the general contract to effect the modifications that eliminated permanent, precast concrete median barrier, leaving Paonessa remediless against the Commonwealth, Chase should similarly be held remediless against Paonessa, because the supply contract between the two incorporated implicitly the conditions of the general contract. To establish such an incorporation, Paonessa relies primarily on language in the purchase orders calling for "980.32 Median Barrier Double Face."

Chase, having previously supplied precast concrete median barriers for State construction projects, would recognize "980.32" as a reference to a particular type and quality of concrete barrier called for in the contract between Paonessa and the Commonwealth. This seems beyond dispute. The figure "980.32" defined the product that Paonessa ordered. The record shows that concrete barriers are produced to several different sets of specifications.[3] Chase is properly charged with knowledge of subsection 980.32 of the general contract, including, it can be argued, the provision that states: "Pay-

[2]The judge also found that "Chase sustained no damages, delay or otherwise, as a result of the reduction in the quantity of highway median barriers." In context this means only that Chase was not out of pocket, not that it did not suffer loss of the profit that it would have received if the order had not been rescinded.

[3]The Chase purchase orders called also for small quantities of another type of barrier, 980.37, the specifications for which appear in that provision of the general contract.

ment will be made at the contract unit price per [l]inear [f]oot measured along the face of the barrier at the gutter line. This will be full compensation for all materials, labor, tools, equipment and incidentals necessary to satisfactorily complete the work."

Subsection 980.32 is given full effect, however, if it is read as defining the product and the method by which the quantity of barrier, 25,800 linear feet, was to be measured. It was not intended to give the Commonwealth or, through incorporation, Paonessa a unilateral power to back out of a contractual obligation. It would surely not limit Chase's right to damages for a contract breach in the event that Paonessa should decide, for example, to switch suppliers and thus to accept smaller quantities or none at all from Chase.

Paonessa also suggests that the Chase-Paonessa contract, by indicating, however cryptically, that the work was for a D.P.W. project, incorporated by reference the terms and conditions known in the trade to be generally applicable to D.P.W. work, including the provisions of the general contract giving the Commonwealth broad power to effect contract modifications with limited (or no) liability.[4] This argument,

---

[4]Reference is made particularly to subsection 4.06 of the general contract conditions, which the Commonwealth cited as the basis of its asserted right to change unilaterally the construction specifications for the median strip. In part this subsection authorized the D.P.W. engineer to "order omitted from the work any items or portions of work found unnecessary to the improvement and such omission shall not operate as a waiver of any condition of the Contract nor invalidate any of the provisions thereof, nor shall the Contractor have any claim for anticipated profit. No allowance will be made for any increased expenses, loss of expected reimbursement, or loss of anticipated profits suffered or claimed by the Contractor resulting either directly or indirectly. . . ."

The requisite finding that certain items are not necessary to the improvement could presumably be subject to challenge if made arbitrarily, capriciously, or in bad faith; but necessity is a flexible concept and is not necessarily confined to considerations of a purely physical nature. The parties do not argue, and the record does not show, that the resident group suit was unmeritorious or frivolous. Although no injunction was issued (as to which see *Webb Granite & Constr Co.* v. *Worcester*, 187 Mass. 385, 390-391 [1905]; *Moshenz* v. *Independent Order Ahawas Israel*, 215 Mass. 185, 187-188 [1913]; *Levenson* v. *Cambridge Sav. Bank*, 258 Mass. 468, 469 [1927]; Restatement of Contracts § 458[b][1932]), the Common-

we think, loads too much into the terse language of the purchase orders, which only call for 25,800 feet of "980.32 Median Barrier Double Face" at $14.50 per linear foot, including delivery to and offloading at the job site. In this respect the judge correctly ruled that the case is governed by *Chicopee Concrete Serv., Inc.* v. *Hart Engr. Co.*, 20 Mass. App. Ct. 315, 320-321 (1985), *S.C.*, 398 Mass. 476, 477-478 (1986). The Paonessa-Chase purchase orders contained no provision contemplating that the quantities called for in those orders might be cancelled or cut back by action of the Commonwealth and its engineer. So far as appears from those orders or from other evidence in the case, the supply contracts were not made subject to the conditions elaborated in the general contract.

## 2. *Impossibility, or Frustration of Purpose.*

We turn therefore to the question whether Paonessa, having failed to adapt the terms of the supply contract to protect itself in the event of subsequent, major modifications in the general contract, nevertheless has a defense under common law principles.

The judge ruled that Paonessa was excused from performing its contract to purchase additional median barrier by the doctrine of impossibility, or, more accurately, frustration of

wealth's attorneys presumably evaluated the group's likelihood of success and, perhaps more significantly, the potential of the litigation to delay the project's completion and thereby cause additional expense. We need not decide whether § 4.06 of the contract would relieve the Commonwealth of liability in such circumstances. The fact that Paonessa, itself blameless, has no certain remedy against the Commonwealth, may, however, have some relevance to part 2 of this opinion, which considers the applicability of the doctrine of impossibility.

It should be emphasized also that the contract modifications, while drastic in their impact on Chase, with whom the Commonwealth did not contract, were modest in scope relative to the entire project. The road resurfacing was unaffected. The reconstruction of the median strip continued, using other materials less offensive to the residents. In terms of dollars, the contract modifications amounted to some three percent of the general contract.

purpose.[5] The doctrine, as applied to supervening events, is described in the Restatement (Second) of Contracts § 265 (1981):

> "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

Here Paonessa's principal purpose in ordering the median barrier was to use it to reconstruct the median strip in accordance with the specifications of the two contracts. It appears substantially clear from the record that Chase knew the purpose. Contrast *Chicopee Concrete Serv., Inc.* v. *Hart Engr. Co.*, 398 Mass. at 478-479. It knew, as earlier discussed, that the work was for a D.P.W. road project; and it is inconceivable that it did not know the particular road project, as it undertook to deliver the barrier segments to the job site within the contract price of $14.50 per linear foot. (Paonessa, for example, would not be able to reroute delivery under these purchase orders to a job site in California; there was, after all, no proof that the cryptic purchase orders constituted the entire contract of the parties. See *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 850 [1973]). Paonessa bore no responsibility for the contract modifications.

The Restatement formulation leads to the conclusion that the parties to the Chase contract were discharged from further performance. The decisive facts are that the D.P.W.'s contract modifications wholly frustrated Paonessa's reason for contracting with Chase; the modifications were not contemplated by either party; and the purchase orders made no

---

[5]Performance was not literally impossible. Nothing prevented Paonessa from honoring its contract to purchase the remaining sections of median barrier, whether or not the D.P.W. would approve their use in the road reconstruction. See 6 Corbin, Contracts § 1322 (1962).

allocation of the risk in the event of such an occurrence. Such a result does no injustice between the parties. Chase was paid for all it produced. The parties share the loss of the profits they each anticipated from the project as originally bid and signed.

We find nothing in Massachusetts cases that casts doubt on the applicability of § 265 of the Restatement to the present situation. In cases of unexpected occurrences that make further performance impossible without fault of either party, the promisee frequently is paid for the work he has done and the parties are then discharged from further performance. Examples are *Gilbert & Barker Mfg. Co.* v. *Butler*, 146 Mass. 82, 85 (1888); *Butterfield* v. *Byron*, 153 Mass. 517, 523 (1891); *Angus* v. *Scully*, 176 Mass. 357, 358 (1900); *Young* v. *Chicopee*, 186 Mass. 518, 520 (1904); *Cochrane* v. *Forbes*, 257 Mass. 135, 150 (1926); *R.Zoppo Co.* v. *Commonwealth*, 353 Mass. 406, 407-408 (1967).

The cases relied on by Chase are distinguishable. In *Gaston* v. *Gorton*, 208 Mass. 265, 269 (1911), and *Imbeschied* v. *Lerner*, 241 Mass. 199, 200-201 (1922), both actions by landlords against liquor store tenants whose purposes in leasing the demised premises had been frustrated by failure to be granted a license (*Gaston*) or by Prohibition (*Imbeschied*), the court held, in effect, that the detailed provisions of the leases imposed on the tenants the risk of unfavorable government action in that highly regulated industry. The same principle was applied in *Baetjer* v. *New England Alcohol Co.*, 319 Mass. 592, 599-602 (1946), where a detailed contract cast on the buyer the known risk of being unable to secure tankers to haul molasses from Puerto Rico to Everett. (This was in 1942, when tankers were being sunk by submarines, and available transport vessels were being requisitioned by the government.) There, the court reasoned: "Whatever may be the extent and validity of [the] doctrine [of frustration], . . . a contracting party cannot be excused where the only 'frustration' consists in the fact that known risks assumed by him have turned out to his disadvantage." *Id.*, at 602, citing, inter alia, the *Imbeschied* decision. In the present

case, by contrast, neither Chase nor Paonessa contemplated the possibility that the D.P.W. would redesign the median strip. Although the *Baetjer* case can be read as possibly dubious of the frustration of purpose principle, the latter seems to have been adopted legislatively (by St. 1957, c. 765, § 1) with the Uniform Commercial Code. See G. L. c. 106, § 2-615, discussed in *Mishara Constr. Co.* v. *Transit-Mixed Concrete Corp.*, 365 Mass. 122, 127-129 (1974)(holding that it was a question for the jury whether labor difficulties and picket lines at the construction site rendered performance by the defendant, a concrete supplier, "commercially impracticable").

In *Boston Plate & Window Glass Co.* v. *John Bowen Co.*, 335 Mass. 697, 702 (1957), it was held that a subcontract was discharged when the general contract was ruled invalid due to noncompliance with bidding law requirements. There the subcontractor recovered nothing for his services (which were preliminary in nature); but this was put on the basis that it had not sued in quantum meruit, but rather for breach of contract, and there was no breach. The subcontractor in *Albre Marble & Tile Co.* v. *John Bowen Co.*, 338 Mass. 394, 398-401 (1959), was allowed to recover some reliance damages; but no preparatory or other reliance damages have been claimed by Chase. In *R.Zoppo Co.* v. *Commonwealth*, *supra*, the recovery corresponded to that already received by Chase in the present case: that is to say, recovery in full for work done, including reasonable profit, but with no recovery for loss of profit for work not done. 353 Mass. at 408.

We hold, therefore, that the judge was correct in ruling that the parties to the Paonessa-Chase supply contract were discharged from further performance when the Commonwealth, without the agreement or acquiescence of Paonessa, ordered that no further concrete median barrier was to be installed in the Route 128 road reconstruction.

*Judgment affirmed.*