JOSÉ RODRÍGUEZ LÓPEZ, Plaintiff and Appellant, *v.* MUNICIPALITY OF CAROLINA, represented by its Mayor JUAN OSORIO and the Commissioner of the Interior SERGIO CUEVAS, Defendants and Appellees.

No. 10681. Argued January 26, 1953.—Decided November 23, 1953.

452

*David Curet Cuevas* for appellant. *Salvador Acevedo Colón*
and *Rubén Gaztambide Arrillaga* for appellee Municipality.
*Víctor Gutiérrez Franqui, Attorney General, A. Torres Bras-
chi* and *M. Rodríguez Alberty,* for appellee the Commissioner
of the Interior.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

On February 26, 1942 Mr. José Rodríguez López,
a contractor, signed a contract of insular public work with
the Municipality of Carolina, for the construction of two
deep wells with a capacity of 400 gallons of water per minute,
which would become a part of the aqueduct system of that
Municipality. The project was to commence on or before
May 4, 1942 and be completed on or before August 4, 1942.
The general inspection of the project would be in charge of
the former Commissioner of the Interior of Puerto Rico.

The contract specified that upon termination of the con-
struction of both wells, a preliminary test would be made,
for which the contractor had to furnish a deep-well pump
driven by electricity or by gasoline and all the necessary
equipment to determine the yield of each well and the cor-
responding water levels. The contract also specified that
after making the preliminary yield test, samples of water
from each well would be taken and submitted to the former
Insular Department of Health and examined as to their
potability for public use. The contractor finished the con-
struction of both wells, and following the instructions specified
in the contract, did not seal them until the tests were made.
The seal after the tests consisted exclusively of a concrete
mold over the upper bearing strata of each well and placing
the corresponding covers over each well.

The preliminary test was made in the presence of the
Mayor of Carolina and of one of the consulting engineers of
the municipality, who incidentally was one of the authors of

the project. It is true that this preliminary test was not made before the resident engineer of the project, who according to the "Instructions to Bidders" would be appointed by the former Commissioner of the Interior, and paid out of funds of the Municipality set aside for that purpose, through the Division of Municipal Works of the former Department of the Interior. But it is nonetheless true that the former Department of the Interior never appointed any inspector for that project, because there were no funds available and the only inspection was made by the Mayor of Carolina and other municipal officials.

At the time the preliminary yield test was effected, the regulations of the Office of Price Administration which rationed gasoline because of the war emergency were in force. A permit was granted to operate the equipment needed for the tests during twenty-four hours. The preliminary yield test was made for twenty-four hours only, and there is even photographic evidence of this. According to the "Contracts Documents," page 3, subtitle "Preliminary Test," letter c, this was the minimum time required for said test. Except for the absence of the inspector of the project, we are forced to conclude, that with respect to the preliminary yield test, there was a substantial performance of the contract. The fact that the resident engineer was never appointed, because there was no funds available, is a waiver of the right to inspection: *Woodworth* v. *Hammond*, 27 N. W. 106 (*Reese*) (1886).

■ The true problem arises with the potability test. The contractor states that the water was sampled by a "Sanitary engineer, a certain Ernesto Seijo." The first thing he asked was whether the place had been sterilized. They told him that it had not been done because there was no hyperchloride, which is a substance used to eliminate bacteria from water and there was none in the island *because the ship bringing it was sunk nearby*. This was the information that the com-

pany gave us. Then, the Municipality and the Department of the Interior gave me sixty days to find the hyperchloride with their help. The Mayor went with me to all those military bases and we could find it nowhere. Finally, we found two cans at the Civil Defense, but they were no good; the chemist told us they were no good, that we should not use them because it was going to increase the pollution of the water. And that was the only thing lacking for the performance of the contract: ... " (transcript of evidence, page 76). The evidence of the defendants-appellees on this particular is a negative certificate where they state that in the files of the former Health Department there is no official record that samples of water had been taken to determine the potability, although a witness for the defendants accepts that there was a Mr. Rafael Seijo at the former Health Department who sampled the water for the Bureau of Sanitation (transcript of evidence, page 105).

Examining carefully the "Documents" which form part of the contract, as to the potability test of the waters, we find the following provision: "When the preliminary test is made, samples of water of each well, the yield of which shall be equal to or greater than the amount specified, shall be taken and submitted to the Insular Health Department for examination and acceptance as to the potability and use for public consumption. The Commissioner of the Interior reserves the right of accepting, with the consent of the Health Department, the water of any well with potable results, but which has a slight contamination susceptible of effective correction by way of chlorination, in a dose not exceeding four (4) pounds per one million gallons of water, in order that it be acceptable in all respects, for human consumption. *In said case, the insular government shall furnish equipment for the chlorination of the waters* and the contractor shall furnish *the same equipment used for the yield tests of the wells* and shall operate it during a period of twenty-four to forty-eight

hours, in order that the Health Department may take the necessary samples of water to be analyzed for the purposes of acceptance. *It is understood that the approval of the well water by the Insular Health Department is an essential requisite for its acceptance by the Department of the Interior of Puerto Rico.*"

Assuming that the sample of water taken during the preliminary yield test was slightly contaminated, if the Commissioner of the Interior, with the consent of the Health Department, was interested in purifying the waters, it was the obligation of the Insular Government and not of the contractor, to furnish an equipment for the chlorination of the water. In this case the obligation of the contractor was exclusively reduced to furnish: "The same equipment used for the yield tests of the wells" and operate it "During a period of twenty-four to forty-eight hours in order that the Health Department may take the necessary samples of water to be analyzed for the purposes of acceptance."

The clearest inferences from all the evidence introduced, especially from the documentary evidence, indicate that the samples of water taken during the preliminary yield tests were sligthly polluted. The letter of November 18, 1942 of the former Assistant Commissioner of the Interior, Mr. Frank Rullán, addressed to the contractor, José Rodríguez López, leaves no room for any other conclusion: "I wish to inform you that this Department having taken the necessary steps with Dr. Oscar Costa Mandry, Head of the Medical Services of the Civil Defense, *to obtain the amount of hyperchloride needed for testing said wells*, he has offered his cooperation towards the possibility of acquiring the aforesaid material through the recommendation of the sanitary engineers Juan G. Figueroa and Gonzalo Diago, Jr., who also volunteered to help. Please call on Mr. Molina, an engineer of this Department, who will inform you of the steps to be taken for ob-

taining said material. We hope that once you get it, *the matter of testing the wells will be settled* and the contract will continue until its completion:" (transcript of the documentary evidence, page 64). We have already seen the result of all these steps: at the Civil Defense they found two cans of hyperchloride but the chemist warned them not to use it because it was ineffective and that if they used it they would increase the pollution of the water.

The evidence is likewise clear in another aspect of the question: that the hyperchloride as well as the gasoline were essential materials for the subsequent potability test of the water, and for the final test; that both materials were rationed by virtue of war emergency, that the hyperchloride could not be obtained because the ship bringing it had been sunk by the enemy, that the gasoline also could not be obtained because the authorities refused the second permit for such use. The appellee insists that the contractor could have installed an electric motor and thereby avoided the need for gasoline. This, however, has to be analyzed jointly with the other cirmumstances contributing to the test: in the first place, in the preliminary yield test, the contract itself establishes that "the contractor shall furnish for the test of each well an adequate deep well pump *driven by electricity or by gasoline* and all the equipment and instruments *essential to determine the yield of each well and the water levels* while pumping," that is the contract left to the option of the contractor and not of the government the choice of a motor driven by gasoline or by electricity; in the second place the installation of a pump driven by electricity would have been to no avail unless the desinfectant needed to treat the pollution of the water could have been obtained at the same time; in the third place, the obligation of the contractor for the chlorination was to supply the same equipment installed for the preliminary yield test; in the fourth place all the efforts of the Mayor, of the former Department of the Interior, of the

former Health Department and of the contractor himself failed in getting the two materials concerned, and not as to one of them only. Therefore, the solution to the problem was not to exchange a pump driven by gasoline for a pump driven by electricity.

Another of the possible inferences adverse to the contractor-appellant is that the hyperchloride was not actually essential for the chlorination of the water, but for sterilizing the place. There is no doubt that the engineers of the former Department of the Interior as well as the engineers of the former Health Department considered, and it is thus clearly established by the letter of Mr. Rullán of November 18, 1942, that the hyperchloride was essential for testing the wells.

To clarify properly the question at issue we shall use the method of exclusion. The apparent conflict in the Spanish as well as in the North American jurisprudence cannot be settled in a brief outline, unless we carefully eliminate successively the different propositions of facts on which that conflict is centered. This is certainly not a case of an action for damages based on the failure to finish the project within a specific or extended period of time, pursuant to Article 29 of the "Instructions to Bidders." Neither the former Department of the Interior nor the Municipality of Carolina has made an estimate of the damages caused by the contractor as a result of their continuing the project in contract. On the other hand, after the approval of Act No. 40 of May 1, 1945 (Sess. Laws, p. 138) establishing the Puerto Rico Aqueduct and Sewer Authority, a new governmental plan of insular scope has probably rendered the wells useless. That alone explains why the Municipality of Carolina did not use the many remedies included in a contract for public works by virtue of which the government may finish the project on the contractor's or his sureties' account.

Undoubtedly, we are not dealing here with a project which was partially unsatisfactory pursuant to Article

42 of the "Instructions to Bidders." Neither the Department of the Interior nor the Municipality of Carolina has proved, that upon examining the project they found that a part was not in accordance with all the requirements of the contract, nor did they try to readjust a new price with the contractor. On the contrary, the evidence shows that the consulting engineers of the municipality considered the project acceptable.

Likewise, we are not dealing with the rescission of a contract pursuant to the cases of rescission established in the same contract according to §§ 32 and 34 of the "General Conditions for the Contracting of Insular Public Works." The evidence does not show that the contractor died and that his heirs or legal representatives are not interested in continuing the contract, nor that the contractor voluntarily failed to comply with the conditions established in the contract. On the contrary, the evidence shows that until November 1942, at least, the government as well as the contractor took every possible step, within the war emergency, to obtain the necessary materials for the tests, and that up to the very moment when the basic materials were rationed, the contractor had performed almost 90 per cent of his contract. On the contrary, likewise, the project is suspended by the Mayor for an indefinite period of time, certainly for more than the three months to which the government was entitled pursuant to § 32 of the "General Conditions for the Contracting of Insular Public Works," but neither was the project temporarily accepted nor any amount paid to the contractor; nor does it appear that the former Commissioner of the Interior agreed to the suspension of the project, which would have rightfully entitled plaintiff to rescind the contract according to its very terms.

It is obviously beyond doubt that this case is not one of substitution of an executing party according to paragraph 8 of the contract signed by the parties. The evidence does not show that the Municipality of Carolina rescinded the contract pursuant to §§ 32, 33 and 34 of the "General Conditions for

the Contracting of Insular Public Works," in which case the contractor would have been entitled to eighty per cent of the amount of work "performed in the project, according to the conditions of the contract." Instead, the evidence shows that the contractor finished the project before the time fixed, up to the point he was bound to build, according to the technical specifications, before proceeding to the preliminary tests, and that he timely furnished the materials and the labor needed.

This is certainly not a case of a contract where the contractor directly and in writing assumed the risk of any unforeseen event. On the contrary § 31 of the "General Conditions for the Contracting of Insular Public Works" admits claims for damages caused to the contractor by the act of God, and among such cases we find expressly listed in the conditions: *"any destruction caused by force of arms in time of war, by insurrection and tumultuous robberies."* Although the phrase is not very clear and exact, there is no doubt that it contemplates three different situations, (1) war, that is, destruction caused by force of arms by a foreign enemy, (2) insurrection, that is, destruction caused by riots of a revolutionary character, and (3) tumultuous robberies, that is, robberies by criminal factions or "groups of rebels," as is contemplated by the classic Spanish jurisprudence. But even considering the phrase in its strictest literal sense, it would not be very difficult to interpret "destruction caused by force of arms in the time of war," as including sinking of ships by submarine action, which actually caused the lack of hyperchloride in the market.

As to the rationing of gasoline it is well to bear in mind that the contract was executed on February 26, 1942 and that it was not until July 20, 1942 that gasoline rationing began in Puerto Rico: Gasoline rationing regulations for Puerto Rico, 7 F. R. 5607, Code of Federal Regulations of the United States of America—Cumulative Supplement—Title 28–32 p. 9399 (United States Government Printing Office Edition)

(1944). Although the nation was under a system of priorities since 1940, it was never considered necessary to ration gasoline. Rationing began in some states of the Union on May 12, 1942, *op. cit.* page 9399. As a matter of public knowledge, during World War I there was no gasoline rationing.

Having excluded from the analysis of the case, the damages caused by noncompletion of the work within the period of time agreed as well as the claim for a partially unsatisfactory project, the contractual rescission for voluntary nonperformance of the contract, the substitution of an executing party, the risk assumed by unforeseen or fortuitous events, the juridical facts impose on us the obligation of applying in the instant case the doctrine of *impossible performance*, or of the *impossibility of performance*, still lawful even if less known, in the general theory of obligations.

The impossible performance is produced when, having examined the circumstances on which a contract is signed and the circumstances on which it should be subsequently performed, it appears that its subsequent performance is not possible, because of supervening circumstances which did not exist at the time of contracting the obligation. In England since the famous "coronation cases," where the contract became frustrated by supervening events, both parties were discharged from further performance of it, but neither could recover damages of any kind for what the obligee had partially performed: "the loss lies where it falls," *Chandler* v. *Webster*, 90 L.T.N.S. 217, (1904), 1 K.B. 493, *Blakely* v. *Muller and Company*, 88 L.T.N.S. 90, (1903) 2 K.B. 760. The principle laid down in *Chandler* v. *Webster* prevailed for many years but that rule was not favored within the critical spirit of its age. Finally on June 15, 1942, the House of Lords, acting in its function as court of last instance rendered judgment in *Fibrosa Spolka Akeyjna* v. *Fairbairn L. C. Barbour*, 167 L.T.N.S. 101, 144 A.L.R. 1298, (1943),

overruling the principle of *Chandler* v. *Webster* under the theory that although there was no provision in the contract on which to base a claim to recover consideration paid under a contract of impossible performance, the circumstances that gave rise to impossibility happened outside of the contract and gave a quasi contractual remedy which permitted the recovery of any part of the contract that had already been performed, 144 A.L.R. 1305.

In Spain the principle of reviewing a contract because the basic circumstances within which it is produced are altered has been gaining greater weight of authority.· Of the inferences to be drawn, with respect to the traditional maxim *"pacta sunt servanda,"*—a fundamental standard in the juridical field—from the implied clause known in all contracts as *"rebus sic stantibus"* (while things thus stand), that is, the enforceability of a contract while the basic circumstances stand as they were when it was executed, we find the following note: "The efficacy of the contract discussed in the section commented...raises the question of how far it may extend, under the fundamental and well-known principle of the *sanction of an obligation*. But contrary to that unfettered force which has been given to agreements, certain doctrinary orientations are now taking shape which are *inspired precisely in the good faith* mentioned in the Section under our consideration and which respond ultimately, to the enhancement of morals in relation to law... One of these limitations is concentrated in the clause which is allegedly implied in every contract, known as *rebus sic stantibus* (while things thus stand) by virtue of which the contract could be annuled, *if an important change supervened in the circumstances existing at the time of the contract* and as to the unfair and excessively onerous result ensuing... As an outcome of the former idea, there has also appeared the idea of the basis of the undertaking, according to which *the disappearance of. the circumstances which the parties set*

*forth and took into account before consenting thereto is a ground for the annulment of the contract.* Finally, the theory of unforeseen risks warrants one of the parties to ask for the review or annulment *by reason of events occurring subsequently to the formation of the contract which might have been unforeseen* and which produce a notorious maladjustment in the undertaking. The weight of authorities recognize the advantage of incorporating such principles into our regulations to raise the moral standard of a contract." 8 Manresa, Volume II, page 326 *et seq.* Edition of the *Instituto Editorial Reus,* (1950).

In the United States the prevailing theory on impossible performance has been mainly influenced by Williston: 6 Williston *on Contracts* 5407 *et seq.* Edition of Baker Voorhis & Co., (1938). For impossible performance to occur the courts have to be satisfied on the following particulars: (1) that the promisor himself be free from fault in the nonperformance; (2) that a series of supervening and unforeseen events, outside the volition of the promisor, should render impossible the performance; (3) that the subject matter of the contract cannot be restored in essence to the party who paid his price within a reasonable time; (4) that the promisor has not directly agreed to assume the risk of all contingencies which may render impossible the fulfillment of the contract. Although the rule contemplates impossibility of performance whenever it is due to an action of war or to an act of God, it is neither limited nor restricted by one or the other. As a principle inspired by equity and a concept of sound justice, impossible fulfillment may result, even though not a case of an action of war or an act of God, as long as the circumstances of total impossibility occur. The fact that the property has deteriorated or has been destroyed and the party who should have received his benefit received none, is no defense against the claim brought by the one who rendered his services, furnished the ma-

terials or the labor necessary for the work. Impracticability in the fulfillment of an obligation is recognized as a form of impossible performance. 6 Williston *on Contracts*, *supra*, pp. 5421, 5419, 5539, 5420, 5551; see also *"Restatement of the Law of Contracts"*, § 468, page 884, (Edition of the *American Law Institute Publishers*), (1932); *Von Waldheim* v. *Englewood Heights Estates*, 179 Atl. 19, (Brogan) (1935), exact citation at pages 21 and 22; *Cochrane* v. *Forbes*, 153 N. E. 566, 569, (Sanderson), (1926).

The juridical effect of impossibility of performance, whenever it supervenes after the contract has been executed and partially performed, is that the parties are discharged from any further liability, and that they are mutually bound to recover back the value of the promises they had received until the date of impossibility. *Tulsa Opera House Co.* v. *Mitchell*, 24 P. 2d 997, 1001 (Osborn), (1933), through the imposition of a new juridical relation of a quasi contractual obligation, *Blockdel Realty Co. Inc.* v. *Doyle*, 6 A. 2d 670, 671 (Lewis), (1939), *Von Waldheim* v. *Englewood Heights Estates*, *supra*, 21, 22 (Brogan), (1935); and the action of assumpsit may be availed of to render valid the new quasi contractual obligation: *Butterfield* v. *Byron*, 27 N.E. 667 (Knowlton), (1891); *Angus et al* v. *Scully*, 57 N. E. 674, (Hammond), (1900); *Young* v. *City of Chicope*, 72 N. E. 63, (Hammond), (1904).

After a close examination of the most trustworthy case law of a legal institution which is still in full development, and striving to keep the purity of concepts from defeating the substantial justice on which the new doctrine is inspired, we adopt the following local rule as our own: in a mutual obligation, where there has been a partial fulfillment of the obligation, where without the promisor's fault a series of circumstances supervene which render impossible the total performance of the obligation, the promisor is released from performing that part of the contract whose fulfillment has become impossible, and unless the promisor has clearly as-

sumed the risk of unforeseen events, of which he could have been fully aware at the time he signed the contract, he is entitled to recover back any services rendered, and any material and labor furnished up to the very moment when the impossibility of the final performance of the obligation supervened; although war action and the act of God are included in the impossibility of performance, other circumstances which create an excessive burden for the promisor are not excluded.

■ As to the amount of recovery, the courts have established the rule that recovery shall always be granted with a view to avoiding any profit or speculation of one party over the other, (*lucratus*) granting only the intrinsic value of the thing (*quantum meruit*), if from the terms of the contract no other measure of compensation arises, and in any event, deducting from the price that part of the contract which has become impossible to perform: *Blockdel Realty Co. Inc.* v. *Doyle*, 6 A. 2d 670, (Lewis), (1939); *Poche* v. *Landry*, 57 So. 2d 808, (McBride), (1952).

■ The theory is the same as regards contracts made between the government and a private individual. When a government has a contract with an individual, it must be construed as if it were one between individuals: *United States* v. *Smoot*, 15 Wall 36, 21 L. Ed. 107, (Miller) (1873); *The Amoskeg Manufacturing Company* v. *United States*, 17 Wall 592, 21 L. Ed. 715 (Miller) (1873); *Reading Steel Casting Co.* v. *United States*, 268 U.S. 186, 69 L. Ed. 907, (Butler), (1925).

■ Applying the theory of the impossibility of the performance to this case we reach the conclusion that since the evidence has shown, (1) that the promisor is free from fault in the performance, (2) that the scarcity of hyperchloride and the gasoline rationing imposed by the emergency of war are circumstances which did not exist when the contract was signed, and which when they intervened, rendered impossible

the fulfillment by both parties as to the testing of the water, (3) that the subject matter of the contract may not be restored in essence and, (4) that the promisor did not expressly and in writing assume the risk of unforeseen events and considering further, (5) that on July 5, 1942, the Mayor of Carolina, Juan Osorio, authorized the stopping of the project until further orders were given,—transcript of the documentary evidence, pages 20 and 21—, according to the powers granted to him by § 34 of the "General Conditions for the Contracting of Insular Public Works," and that subsequently the continuation of the project was not ordered, it is obvious that he is entitled to recover back for his professional services, for the material furnished and the labor contracted for said construction until the very moment when the fulfillment became impossible.

As to the amount of the judgment, the contract signed between the parties does not offer us a satisfactory method for calculating the amount. The divisibility of the price begins precisely after the preliminary test is concluded. But the contract serves to show us the extent of the obligation which remained unfulfilled. After the installation of the equipment for the preliminary yield test and the sampling of water, the obligation of the contractor was limited to build "the gravel wall and the concrete seal indicated in the plan, if that was the type of the well." Once the final test is terminated, "the contractor shall furnish and place an appropriate cover, as shown in the plan on each one of the wells accepted by the Department of the Interior and shall proceed to clean and fix properly the place or places where said wells have been constructed... removing rubbish, etc., according to the indications of the resident Engineer and to his entire satisfaction," ("Contract Documents," page 4). The impossibility of final performance occurs during the preliminary test when because of the scarcity of hyperchloride the slightly polluted water cannot be purified. Having in mind the rule

established as to avoiding any profit due to partial nonper-' formance, we believe that a compensation of 75 per cent of the total price of the contract duly compensates the contractor in the instant case.

The judgment rendered will be reversed and another entered instead ordering the Municipality of Carolina to pay to the contractor, Mr. José Rodríguez López, the amount of six thousand dollars, for the entire value of his services, the materials furnished and the labor contracted to carry out said construction, without costs or attorney's fees.