JJ Associates, Inc. *vs.* Fall River Housing Authority
& others.[1]

Plymouth.  May 11, October 31, 1984. — December 3, 1984.

Present: Brown, Cutter, & Kass, JJ.

*Public Works. Contract*, Public works, Subcontract.

In light of the requirement of approval by the United States Department of
Housing and Urban Development for the award of a general contract
for work on a public housing project and of the subbid substitution
provisions of G. L. c. 149, an award by a public housing authority of
a general contract which had not yet been approved by the Department
did not preclude the authority from subsequently requiring the general
contractor to substitute a lower qualified subbidder for plumbing work
for the subbidder initially selected by the general contractor. [50-51]

Where it appeared that a local housing authority had not been legally required
to set certain affirmative action goals specified in its request for bids on
a public works project, the authority was free, after awarding the general
contract but before approval by the Department of Housing and Urban
Development, to require the general contractor under the provisions of
G. L. c. 149 to substitute for a subbidder who met these goals one with
a lower bid who did not. [51-54]

Civil action commenced in the Superior Court Department
on January 5, 1984.

The case was heard by *Francis Keating*, J., on a motion for
summary judgment. A motion for injunctive relief filed in the
Appeals Court was heard by *Dreben*, J.

[1] The individual members of the Authority, R.J. Marshall, Inc. and Montle
Plumbing and Heating Co., Inc. This matter was originally argued before
the panel on May 11, 1984. On September 7, 1984, it was ordered that
supplemental briefs be submitted by the parties discussing various questions
now dealt with in part 2 of this opinion. Briefs of amici curiae have been
received on the court's request (made through the Attorney General) from
the Division of Capital Planning and Operations (DCPO) and the State
Office of Minority Business Assistance (SOMBA). The last of the supple-
mental briefs was received on October 31, 1984. These additional briefs
have been of substantial assistance.

*John C. Wyman (Joel M. Sowalsky & Anne H. Stossel* with him) for the plaintiff.

*Manuel Kyriakakis* for Fall River Housing Authority.

*Peter Lawson Kennedy* of Rhode Island (*John Anthony Tarantino* with him) for R.J. Marshall, Inc.

*Herbert H. Hershfang* for Montle Plumbing and Heating Co., Inc.

*Clyde E. Lindsay,* for State Office of Minority Business Assistance, amicus curiae, submitted a brief.

*Robert P. Garrity,* for Division of Capital Planning and Operations, amicus curiae, submitted a brief.

CUTTER, J. This controversy relates to a project for renovations at the Fall River Housing Authority's (Authority) Sunset Hill Project. Bids for the project were sought under the provisions of G. L. c. 149, §§ 44A-44H. The "Instructions to Bidders" contained, among others, the following provisions: "14. AWARD OF CONTRACT. The Contract will be awarded . . . to the lowest responsible and eligible bidder. Such award shall be made within thirty working days after HUD approval. . . . 22. GOVERNMENTAL APPROVAL. Awards and contracts may be subject to the approval of the Federal Government." See as to the inclusion of these provisions, G. L. c. 149, § 44(A)(3). The advertisement for bids pointed out that "[t]he award of this contract will take place following the execution by . . . HUD of the annual contribution contract."[2]

---

[2] The request for bids also contained the following statements: "1. Policy. The . . . Authority has adopted, as part of its Affirmative Action Plan, a resolution that all contracts awarded by the Authority shall have a goal of 20% for Minority and Women Business Enterprise [MBE and WBE] participation. It is its objective in carrying out its Affirmative Action Plan that MBE/WBEs shall have the maximum opportunity to participate in the performance of this contract. 2. MBE/WBE OBLIGATION. Bidders on this contract are requested to establish a goal to commit to MBE/WBEs 20% of the total dollar amount of the construction contract. All minority business utilized are required to be . . . [State Office of Minority Business Assistance] certified. Bidders are requested to use positive efforts to utilize minorities from the Directory supplied by the State Office of Minority Business Assistance . . . . 3. Minority suppliers can be counted for up to 50% of the goal. 4. AWARD COMPLIANCE AND SANCTIONS: Contractors are required to execute and submit a Schedule of and Letter of Intent signed by the

   Plumbing subbids for the renovation work were opened on October 26, 1983. The bid of Montle Plumbing and Heating Co., Inc. (Montle) was the low bid at $1,194,700. The bid[3] of JJ Associates, Inc. (JJ) at $1,250,000, was the second lowest. When the general bids were opened on November 2, 1983, the bid ($10,795,000) of R.J. Marshall, Inc. (Marshall) was the lowest. Marshall had included in its own general bid JJ's subbid as the plumbing component of the general bid.

   Marshall, on November 4, 1983, notified JJ that Marshall intended to enter into a plumbing subcontract with JJ as soon as the Authority should award it a contract. On November 8, 1983, the Authority, by Martin Zenni, its acting executive director, wrote to Marshall calling its attention to what is now G. L. c. 149, § 44F(4)(*b*), as appearing in St. 1980, c. 579, § 55.[4] Zenni's letter then proceeded, "the [b]udget for this

---

minority [subbidder] at the bid opening showing the dollar amount and percentage participation that the minority business will receive. In the event a bidder fails to conform to its MBE/WBE obligation, it will be expected to explain, in writing to the Authority, the reasons for their non-utilization. If there is non-utilization without cause, the Authority can make the contract non-responsive."

   [3] JJ's bid was expressly restricted to use with an award of the general contract to R.J. Marshall, Inc.

   [4] Section 44F(4)(*b*) reads in part: "(*b*) If, after the selection of the lowest responsible and eligible general bidder, it be decided to consider sub-bidders other than the ones named by such general bidder in his general bid, the awarding authority and such general bidder shall jointly consider all filed sub-bids not rejected under section forty-four F(3). Any agreement to substitute a sub-bid for the one named in the selected general bid shall result in an adjustment of the general bid price by the difference between the amount of the sub-bid originally named and the amount of the sub-bid substituted therefor. . . ." A closely related statutory provision is G. L. c. 149, § 44E(2), as appearing in St. 1980, c. 579, § 55, which states the obligations of a bidder for the general contract. These include the obligation, if selected as general contractor, promptly to "confer with the awarding authority on the question of sub-bidders; and . . . the awarding authority may substitute for any sub-bid listed above a sub-bid duly filed with the awarding authority by another sub-bidder for the sub-trade against whose standing and ability the undersigned makes no objection; and that the undersigned will use all such finally selected sub-bidders at the amounts named in their respective sub-bids and be in every way as responsible for them and their work as if they had been originally named in this general bid, the total contract price being adjusted to conform thereto . . . ."

project is very . . . tight. It is therefore respectfully requested that you [Marshall] consider using the low sub-bidder for 'plumbing' in order to save $55,300." A copy of this letter was sent to the United States Department of Housing and Urban Development (HUD).

On November 14, 1983, the Authority purported to award to Marshall the general contract for the project by its Resolution No. 135 for a total amount of $10,795,000. The Authority's chairman was authorized, "subject to the approval of" HUD, to execute the then proposed general contract. On the same day, the Authority and Marshall each executed a contract for the project work for this amount in which JJ was shown as the plumbing subcontractor at its bid price. By art. 5 of this contract the advertisement for bids and bidding documents were incorporated in the general contract by reference.[5] There took place about this time correspondence summarized in the margin.[6]

The Authority's board, on November 21, 1983, after a telephone poll, voted that Marshall "be instructed to substitute the

[5] An affidavit of Zenni dated February 1, 1984, refers to meetings of the Authority board on November 14 and 25, 1983, and January 9, 1984. From this affidavit it appears that on November 14, 1983, the board members were told that the "the request" for Montle's substitution as plumbing subcontractor "was being continued on behalf of the Authority."

[6] (a) Marshall, by letter dated November 15, 1983, wrote to the Authority that it felt "a commitment to use JJ . . . because . . . [that] company represents the 10% WBE . . . required by the specifications." "WBE" (see note 2, *supra*) stands for "women's business enterprise" essentially as that term is defined in G. L. c. 7, § 40C(2), inserted by St. 1980, c. 579, § 7.

(b) On November 15, 1983, Marshall sent a memorandum to all its "filed subbidders" directing them to sign and return enclosed subcontracts and to pay for any required performance bonds. JJ received such a subcontract, not signed by Marshall. JJ signed the subcontract and returned it to Marshall. Marshall has never signed it.

(c) On November 17, 1983, the Authority's architect wrote to SOMBA (see note 2, *supra*) reporting that the Authority had voted to award the general contract for the project to Marshall which "is proposing to use minority . . . or women business enterprises that will provide approximately 21% utilization for this project." The letter then listed about $2,332,000 of subbids (including that of JJ for $1,250,000).

Part of this correspondence was rendered inaccurate by the subsequent substitution of Montle for the plumbing subcontract.

sub-bid of Montle . . . for the subbid of" JJ, on the basis that "Montle . . . is the lowest responsible sub-bidder and that an appropriate reduction of $55,300 be made in the overall [project] bid price." On that day, also, the Authority's chairman issued a news release to the same effect. Zenni, for the Authority, on November 21, 1983, wrote to Marshall that the latter was "instructed to substitute the subbid of Montle . . . for" JJ's subbid, and "to make a reduction of $55,300 in . . . [its] overall general bid price, for a new total of $10,739,700." At a meeting of the Authority's members on November 25, 1983, a resolution was adopted which (1) "accepted" Marshall's bid as revised by the substitution of Montle's plumbing subbid, thus reducing the over-all contract price to $10,739,700, and (2) directed the submission of the general contract as revised to Marshall for execution by it. That contract was apparently executed by the Authority and Marshall on November 25, 1983, subject to HUD approval, which (dated December 6, 1983) was received on December 8 or 9, 1983. A plumbing subcontract between Montle and Marshall was executed on November 28, 1983.[7]

On November 22, 1983, JJ notified the Authority that it objected to the substitution of Montle as the subcontractor for plumbing, and on November 30, 1983, JJ filed a protest with the Department of Labor and Industries. This was heard (see G. L. c. 149, § 44H) by a senior departmental counsel, who sustained JJ's protest essentially for the reason that, in his opinion, the Authority's statutory right to compel Marshall

---

[7] There were several resolutions by the Authority in late November, 1983, and thereafter, which do not appear significantly to affect the basic facts set out in the text of this opinion. *November 25, 1983,* — Resolution No. 151, rescinding the resolution of November 14 (awarding the general contract to Marshall) contingent upon Marshall's signing the new revised general contract at the reduced price; *January 9, 1984,* Resolution No. 179, rejecting JJ's subbid for various reasons including (a) that JJ's was not the lowest responsible and eligible bid, (b) a protest by Fall River building trades that JJ was nonunion, a circumstance that might lead to pickets at the project, and (c) that JJ had not filed a requested prequalification statement as to its capacity to do the plumbing work, and Resolution No. 180, in effect ratifying the Authority's earlier action in awarding the revised general contract to Marshall.

to accept substitution of Montle (as the plumbing subcontractor) ended when the Authority and Marshall signed the unrevised general contract of November 14, 1983, which listed JJ as the plumbing subcontractor at its original bid. Despite the Department's ruling on JJ's protest, the Authority proceeded with its revised general contract, and Marshall went forward with its plumbing subcontract with Montle.

JJ filed this complaint on January 5, 1984, seeking various forms of injunctive and declaratory relief, especially a declaration that the Authority and Marshall had entered into a binding general contract on November 14, 1983, and that the Authority could not direct Marshall to substitute Montle as a plumbing subcontractor after that date. The pleadings were completed promptly. Montle was allowed to intervene as a party. Essentially the facts already stated above were established by admissions in the pleadings or by affidavit.

A Superior Court judge on February 17, 1984, denied JJ's motion for summary judgment and declared (a) that Marshall never entered into a binding agreement with JJ to perform the plumbing work on the project, and (b) that the Authority in obtaining substitution of Montle (for JJ) acted in a manner consistent with its responsibility. The judgment dissolved all outstanding injunctions against proceeding with the project, and ordered that Marshall proceed with it at the revised price. JJ appealed.[8]

1. General Laws c. 149, § 44F(4)(*b*) and § 44E(2), see note 4, *supra*, contemplate that an awarding authority may compel the substitution of qualified subbidders for subbidders initially selected by the general contractor. See *Roblin Hope Indus., Inc.* v. *J.A. Sullivan Corp.*, 6 Mass. App. Ct. 481, 483-489 (1978). There is no contention by Marshall or any other party in this case that Montle is not a plumbing contractor qualified to perform the plumbing subcontract. From pars. 14 and 22 of the Instructions to Bidders, mentioned in the first paragraph

---

[8] On review by a single justice of this court, injunctive relief also was denied not only with respect to further proceedings in the trial court, but pending this appeal. The appeal from the Superior Court judgment and the appeal from the order of the single justice were consolidated by the latter.

of this opinion, JJ, the Authority, and Marshall were placed on notice that the award of the general contract was subject to HUD's approval. From the *Roblin Hope* decision, JJ was bound to recognize that the Authority could force Marshall to accept a lower plumbing subbid, unless Marshall had some reasonable objection to the responsibility and standing of the substituted subbidder. Consequently, the execution of the general contract of November 14, 1983, by the Authority and Marshall was necessarily subject to the possibilities (a) that HUD might not approve that contract at all, and (b) that the Authority might require Marshall to substitute subbids more favorable to it. We do not accept the conclusion of the Department of Labor and Industries that the contract signed on November 14 became effective immediately and irrevocably before the substitution of Montle was effected. See *Johnson Controls, Inc.* v. *School Comm. of Boston*, 17 Mass. App. Ct. 1039, 1040 (1984). Even if the contract of November 14, 1983, was a commendable effort of the Authority and Marshall to expedite the prospective paper work on the project, that effort provides no justification for disregarding (a) the requirement of HUD approval or (b) the subbid substitution provisions of G. L. c. 149. The general contract remained subject to change and each subbid remained subject to substitution until HUD approval was obtained.

2. We turn now to the question of the "goals" for the participation of minority business enterprises (MBEs) and women's business enterprises (WBEs) mentioned by the Authority in the invitation for bids (note 2, *supra*). Because the briefs did not adequately discuss this matter, we requested (see note 1, *supra*) further briefs and the stipulation of certain relevant facts (or an expansion of the record to show them).

The principal additional fact stipulated by the parties (in response to our order) is that the "Authority formally adopted on February 4, 1984[,] a goal of 20% MBE/WBE participation in all [Authority] contracts . . . . Prior to that time the Authority had informally adopted such a goal," which "was not set forth

in any formal document other than proposals and contracts issued by the Authority."[9]

In its brief as amicus curiae, DCPO (see note 1, *supra*) asserts (a) that the responsibilities of that agency under G. L. c. 7, §§ 39A-43I (inserted by St. 1980, c. 579, and St. 1982, c. 357, § 3), extend only to "state agenc[ies]" as defined in § 39A(*v*) and that c. 7, § 40C(2), applies only to such "state agencies"; (b) that a local housing authority, by definition in § 39A(*r*) is a "public agency," and (c) that DCPO has (with respect to local housing authorities) power only to set certain minor requirements for record keeping and reporting and making recommendations, a power which, so the brief states, DCPO has never exercised. The assertions of DCPO are supported by the relevant statutes, with the consequence that any compliance by a local housing authority with c. 7, §§ 39A-43I, is voluntary and not mandatory.[10]

The Authority's supplemental brief asserts that the Authority is subject to the supervision of the Department of Community Affairs (DCA) and to that Department's rules and regulations adopted under G. L. c. 121B, § 29, and related statutory provisions. See G. L. c. 23B, § 6; *Commissioner of the Dept. of Community Affairs* v. *Medford Housing Authy.*, 363 Mass. 826, 829-830 (1973). See also 760 Code Mass.

---

[9] Other possibly relevant facts stipulated were (a) that no Federal agency suggested to the Authority that Montle be substituted for JJ as plumbing subcontractor on the project, and (b) that, as of October 3, 1984, Marshall (as general contractor) has developed eleven percent participation by MBE and WBE entities in this project and will have an additional one percent of such participation if one supplier or subcontractor is certified by SOMBA.

[10] An amicus brief filed by SOMBA (see note 1, *supra*) contends that the Authority (even prior to its formal adoption on February 4, 1984, of a goal of 20% MBE/WBE participation in Authority contracts) was bound to enforce the policies of c. 7, §§ 39A-43I, because of the Authority's use, in advertising this contract, of forms expressing SOMBA's MBE/WBE objectives. SOMBA relies upon *Bloom* v. *Worcester*, 363 Mass. 136, 151-160 (1973), and *Yetman* v. *Cambridge*, 7 Mass. App. Ct. 700, 702-704 (1979), each discussing possible conflicts between (a) State statutes and policies and (b) city ordinances, and whether the latter may frustrate the statutory policy, a problem not directly pertinent to the question whether a State statute is by its terms mandatory as to certain public entities.

Regs. §§ 33.01-33.10 (1979). No party has referred to any DCA regulation in any manner affecting the present controversy and no such regulation has been shown to exist.

The recently stipulated facts (see note 9, *supra* and the related text of this opinion) and DCPO's interpretation of the statutory provisions (G.L. c. 7, §§ 39A-43I) administered by it as not permitting their mandatory application to local housing authorities, appear to us to control the present controversy. We are convinced that, at least prior to a formal adoption by the Authority of the "goals" of those statutory provisions, the Authority was acting on a purely voluntary basis in taking steps to achieve those MBE/WBE "goals." The Authority, we think, remained free to change its position and to require Marshall, under G. L. c. 149, § 44F(4)(*b*), to substitute for JJ's plumbing subbid the substantially less costly Montle plumbing subbid until the contractual arrangements became final by HUD's approval.[11]

It is apparent that there is some conflict among various legislative objectives and that some statutory objectives remain essentially voluntary as to local housing authorities and perhaps other public entities. The provisions of G. L. c. 149, § 44F, carry out a part of one statutory policy designed to keep down the cost of public construction by competitive bidding and give principal weight to price considerations. That policy, however, has not been adjusted fully to the different legislative objective of affording special opportunities for MBE/WBE participation in public construction contracts. No pertinent regulations have been adopted by DCA which in some degree might lessen the possibility of policy conflicts. The area appears to be one where the risk of confusion would be reduced greatly by a more complete and explicit expression of legislative intention. We can only deal with the situation under the relevant statutes as

---

[11] Any other conclusion, of course, would result in serious hardship to Marshall and to Montle, each of which appears to have acted in good faith to comply with the Authority's request, after a protest by Marshall to the Authority.

they existed in late 1983 and the administrative action then taken under those statutes by the parties.[12]

> *Judgment affirmed.*
>
> *Order of single justice denying injunctive relief affirmed.*

---

[12] On this record, we need not and do not decide (a) what, if any, remedies may exist against Marshall (or the Authority) for any failure to meet the announced MBE/WBE "goals" (see note 2, *supra*), as to this project; (b) whether the Authority now is barred from asserting any claim against Marshall for any failure to meet requirements for satisfying MBE/WBE "goals" by insisting that Marshall substitute Montle as plumbing subcontractor to save $55,300 with knowledge that Marshall (see note 6, par. [a], *supra*) was relying on a plumbing subcontract with JJ to satisfy that "goal"; (c) whether the Authority by pressing for the substitution of Montle in effect has relinquished its affirmative action "goals" on this project; (d) whether and to what extent Marshall, in the aggregate, has complied (or is bound to comply) with the "goals" by other methods than the use of JJ as plumbing subcontractor; or (e) whether JJ, rather than the Attorney General or some State agency, has "standing" to enforce against the Authority and Marshall compliance with any MBE/WBE objectives with respect to this project. We, of course, do not intimate that mandatory requirements for MBE/WBE participation, if applicable to a particular project, may be set aside lightly or easily avoided.