CHICOPEE CONCRETE SERVICE, INC. *vs.* HART ENGINEERING CO.

Suffolk. February 6, 1985. — July 3, 1985.

Present: PERRETTA, KAPLAN, & DREBEN, JJ.

*Contract*, What constitutes, Performance and breach, Building contract.

Correspondence between a general contractor and a supplier of concrete who, at the request of the general contractor, had submitted prices which the contractor used in preparing its bid on a public works project warranted the conclusion that there was an enforceable contract for the supply of concrete for the project between the general contractor and the supplier. [317-319]

Where a contract between a general contractor and a subcontractor under which the subcontractor was to supply concrete for a public works project did not incorporate the general contract in its entirety and did not specifically incorporate a clause of the general contract providing that all subcontractors were subject to approval by an engineering firm representing the awarding authority, the engineering firm's refusal to approve the subcontractor did not justify the general contractor in terminating the subcontract. [319-321]

CIVIL ACTION commenced in the Superior Court Department on September 13, 1979.

Motions for summary judgment were heard by *Mel L. Greenberg*, J.

*Peter J. Gagne* for the plaintiff.

*Francis M. Lynch*, for the defendant.

PERRETTA, J. The defendant (Hart) was awarded a contract by the city of Holyoke for the construction of a waste water treatment plant. In preparing its bid, Hart used prices for concrete that had been submitted to it by the plaintiff (Chicopee), a concrete supplier and Hart's proposed subcontractor. The general conditions of the contract between the city and Hart provided that all subcontracts were subject to the approval of

the engineering firm (Tighe & Bond/SCI, hereinafter Tighe) representing the city. When approval of Chicopee was not given, Hart selected another subcontractor, and Chicopee brought this action for breach of contract against Hart. Both parties moved for summary judgment; Chicopee's motion was limited to the issue of liability. The judge concluded that, although there was a valid contract between Chicopee and Hart, that contract was subject to approval by the city's engineering firm. Because approval was denied, Hart did not wrongfully terminate the contract. We conclude that the approval clause in the prime contract was not made a part of the enforceable contract between Hart and Chicopee and reverse the judgment.

I. *The Undisputed Facts.*

In preparing its bid for the city's construction project, Hart requested Chicopee's price quotations for cement. By letter to Hart, dated September 12, 1978, Chicopee quoted its prices which, in turn, were used by Hart in calculating its bid on the project. On November 2, 1978, Hart directed a letter to Chicopee which contained three statements here important:

(1)  "This will confirm our intention to award the purchase order for the following: . . . [list of concrete mixes and prices]."

(2)  "This award will be subject to our receiving a formal contract from the proper awarding authorities."

(3)  "Your attention is directed to the Contract & General Conditions, Supplementary General Conditions, Special Conditions, Information for Bidders, and the Technical Specifications which will be made a part of your purchase order. You are specifically cautioned to fully comply with all the requirements pertaining to Nondiscrimination in Employment and the President's Executive Order 11246."

In anticipation of working on the project, Chicopee expanded its facilities and purchased new equipment. The city awarded Hart the prime contract on December 20, 1978, and on January 25, 1979, Hart sent its purchase order to Chicopee, the first paragraph of which reads, in pertinent part: "Furnish all materials and equipment to perform the 'SCOPE OF WORK' hereto attached in strict accordance with plans and specifications entitled 'Holyoke Wastewater Treatment Plant Improvements' . . . as prepared by Tighe & Bond/SCI, including all drawings listed therein . . . General Terms & Conditions, codes, and other publications referred to therein." Chicopee added qualifications to two of the terms of the purchase order,[1] which it then signed and delivered to Hart, along with the usual and necessary bonds, on March 19, 1979. At that time, Chicopee was unaware that four days earlier, March 15, 1979, Tighe had rejected Hart's proposal to use Chicopee as the concrete supplier. Hart withdrew its purchase order to Chicopee on March 21, 1979.

II. *The Hart-Chicopee Contract.*

The judge concluded that "[a]n enforceable contract was formed" between Chicopee and Hart "upon the issuance" of Hart's purchase order of January 25, 1979. We agree with this conclusion and the following reasoning upon which it rests.

A subcontract for the sale of concrete is controlled by G. L. c. 106, the Uniform Commercial Code. See *Mishara Constr. Co.* v. *Transit-Mixed Concrete Corp.*, 365 Mass. 122, 124 (1974). Section 2-204(1), inserted by St. 1957, c. 765, § 1, provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

---

[1] Hart required that Chicopee employ workers who "can work in harmony with all other" workers on the project. To this Chicopee agreed, except for the "signing of a new Union Contract other than that we already have." The purchase order also provided that Chicopee's prices were to remain "firm through life of project" and were to be discounted $.60 per cubic yard. Chicopee accepted the discount but limited it to "for payment 15th prox. only" (which we construe to mean if paid within a certain time) and also limited "firm" prices only through 1980.

Chicopee, on September 12, 1978, in response to a request from Hart, had submitted a price list which Hart used in preparing its bid on the prime contract. Hart advised Chicopee on November 2, 1978, that it intended to award Chicopee the purchase order if it were awarded the contract by the city. In anticipation of the purchase order, Chicopee expanded its facilities. "An offer is made when the offeror leads the offeree to reasonably believe that an offer has been made. *Timmins* v. *F. N. Joslin Co.*, 303 Mass. 540 . . . (1939). *Kuzmeskus* v. *Pickup Motor Co.*, 330 Mass. 490 . . . (1953)." *Gilbert & Bennett Mfg. Co.* v. *Westinghouse Elec. Corp.*, 445 F. Supp. 537, 545 (D. Mass. 1977). Thus, Chicopee's price list was accepted by Hart, see *Loranger Constr. Corp.* v. *E. F. Hauserman Co.*, 376 Mass. 757, 762 (1978) (use of one's estimate by another in submitting a bid can constitute acceptance of an offer, even without notification to the offeror), and there was, as of November 2, 1978, at the very least, an agreement subject to the drafting of the purchase order, that is, a "formal memorial of the terms."[2] *Nigro* v. *Conti*, 319 Mass. 480, 482 (1946). See also *Sands* v. *Arruda*, 359 Mass. 591, 594 (1971).

Hart relies upon various cases[3] to argue that the letters of September 12 (Chicopee's price list) and November 2 (Hart's response) were mere steps in the negotiation process. However, a reading of those cases shows them to be distinguishable on the basis of the writings therein involved and the conduct of the parties in light of the writings.

Moreover, even were we to view Hart and Chicopee's letters and conduct as mere negotiation, we would nonetheless conclude that Hart's purchase order constituted a valid contract. See *Mishara Constr. Co.* v. *Transit-Mixed Concrete Corp.*, 365 Mass. at 124. Hart argues that, because Chicopee changed the terms of the purchase order, see note 1, *supra*, there was

---

[2] Hart argues that its letter of November 2, 1978, was at best "a step in the negotiations looking to the issuance of Hart's purchase order."

[3] *Interstate Indus., Inc.* v. *Barclay Indus., Inc.*, 540 F.2d 868 (7th Cir. 1976). *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. 363 (1972). *Tull* v. *Mr. Donut Dev. Corp.*, 7 Mass. App. Ct. 626 (1979).

no acceptance by Chicopee, and hence, no contract. As we read G. L. c. 106, § 2-207(1) and (2),[4] Chicopee's insertions only raise the question whether those terms become parts of the contract between Hart and Chicopee. See *Leonard Pevar Co.* v. *Evans Prod. Co.*, 524 F. Supp. 546, 549-552 (D. Del. 1981); *Gard Industrial Plastics, Inc.* v. *Aubrey Mfg., Inc.*, 103 Ill. App. 3d 380, 385-386 (1982). See also 2 Anderson, Uniform Commercial Code § 2-207:12 (3d ed. 1982). Although that question may or may not be relevant to the issue of damages (keeping in mind the nature of Chicopee's insertions and the fact that the contract was repudiated before performance commenced), it does not alter the fact that there was a valid contract between Hart and Chicopee.

III. *The Breach.*

Whether Hart was justified in withdrawing its purchase order after Tighe rejected Chicopee as a concrete supplier turns on whether the owner-approval clauses[5] of the prime contract had been made part of the contract between Hart and Chicopee.

---

[4] Sections 2-207(1) and (2), inserted by St. 1957, c. 765, § 1, provide:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) the offer expressly limits acceptance to the terms of the offer;
    (b) they materially alter it; or
    (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

[5] Hart points to three clauses in the first of the two volume "Specifications For Construction" of the project which require that subcontracts be conditioned upon Tighe's approval. Paragraph G of the "Proposal Form for Sub Bid" provides that the subbidder "agrees to be bound to the General Contractor by the terms of the hereinbefore Plans, Specifications (including all general conditions stated therein), and addenda, and to assume toward him all the obligations and responsibilities that he, by those documents,

The judge concluded that the purchase order "effectively incorporated the provisions of the prime contract in the subcontract."[6] We do not agree.

In the absence of unambiguous and appropriate language in the purchase order incorporating either the owner-approval clause or the prime contract in its entirety, all that is impliedly incorporated into the subcontract is the obligation of the subcontractor to perform as the general contractor is bound to do "in relation to the particular part of the work to be performed." *Vappi & Co.* v. *Sullivan,* 331 Mass. 463, 467 (1954). See *John Soley & Sons* v. *Jones,* 208 Mass. 561, 566-567 (1911).

If there was wholesale incorporation of the terms of the prime contract into the purchase order, it must be by reason of the purchase order's proviso that Chicopee was to "[f]urnish all materials and equipment required to perform the 'SCOPE OF WORK' . . . in strict accordance with plans and specifications [of the prime contract], including . . . [the] General Terms and Conditions . . . ." We do not see in this language, notwithstanding the reference to the "General Terms and Conditions" and, hence, art. 58, as well as paragraph HH of art. 80 of the "Special Conditions," anything other than an incorporation of those terms of the prime contract which are germane to the work to be performed by the subcontractor in behalf of the contractor. See *Frederick Raff Co.* v. *Murphy,* 110 Conn. 234, 240 (1929) ("The securing of the consent of the engineers in charge of the work to the making of the contract between the parties, as required by the specifications, was not made an express condition of that contract nor are facts found from which a condition could be implied in fact"). Compare *Farm-Rite Implement Co.* v. *Fenestra, Inc.,* 340 Mass. 276, 281 (1960), *S.C.,* 342 Mass. 427, 431 (1961), where the cross

---

assumes toward the owner." Article 58 of the "General Requirements" and paragraph HH of the "Special Provisions" provide that the contractor cannot "sublet" any of the work without prior written consent of the owner.

[6]The parties have not argued, and we have not considered, the applicability of G. L. c. 149, § 44D, as in effect in 1979, to this controversy.

references in the various documents were held to give rise to incorporation of the prime contract clause in question.[7]

Our conclusion that the prime contract had not been incorporated in its entirety is reinforced by the fact that part of the prime contract which was not particular to the work to be performed was incorporated into the purchase order by express and unambiguous language: "You are specifically cautioned to fully comply with all the requirements pertaining to Nondiscrimination in Employment and the President's Executive Order 11246 and amendments." The approval by Tighe of Hart's use of Chicopee as the concrete supplier for the project was not a condition of the contract between Hart and Chicopee. Hart's inability to obtain Tighe's approval of Chicopee did not immunize Hart from liability to Chicopee for breach of contract.

IV. *Conclusion.*

It follows from what we have said that the judgment is reversed. Summary judgment on Chicopee's limited motion is to enter, and the matter is to stand for further proceedings on the question of damages.

*So ordered.*

---

[7] We are not unmindful of the fact that on February 15, 1979, Tighe wrote to Hart requesting further information bearing upon Chicopee's ability to perform the required work, that Hart forwarded that letter to Chicopee with a request that the information be furnished, and that on February 27, 1979, Chicopee provided the requested information to Hart. Even assuming that the letter lends itself to an inference that Chicopee was thereby put on notice that owner approval was part of the prime contract, an affidavit signed by Chicopee's president specifically denies knowledge of "any engineer or owner action on Chicopee." Hart's affidavit is silent on the issue of actual notice to Chicopee. Compare *JJ Associates, Inc.* v. *Fall River Housing Authy.*, 19 Mass. App. Ct. 45, 46-47, 50-51 (1984). Additionally, we note that in its answer Hart admitted that on March 13, 1979, it notified Chicopee that if the purchase order of January 25, 1979, and a satisfactory performance bond were not received by Hart by March 19, 1979, the purchase order would be "null and void."

As it is assumed for purposes of deciding this case that Chicopee did not have actual knowledge of the owner-approval clause, we need not consider whether such knowledge would be relevant to the question whether Chicopee was thereby bound irrespective of incorporation of the prime contract in the purchase order.