EMPIRE MASONRY CORP. *vs.* TOWN OF FRANKLIN &
another.[1]

No. 89-P-1331.

Suffolk. February 15, 1990. - June 22, 1990.

Present: ARMSTRONG, KASS, & JACOBS, JJ.

*Public Works*, Bidding procedure. *Contract*, Bidding for contract, Subcon-
tract. *Statute*, Construction.

A general contractor and a public authority awarding it a construction
contract under G. L. c. 149, §§ 44A-44H, are bound to apply the sub-
bid substitution procedures prescribed in G. L. c. 149, § 44F (4) (*c*),
notwithstanding the fact that the low subbidder withdraws its subbid
after execution of the general contract; moreover, the general contrac-
tor is not required by § 44F (4) (*c*) to obtain executed subcontracts
(with the subbidders the contractor intends to use) prior to the execu-
tion of the general contract. [709-716]

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 26, 1989.

A motion for preliminary injunctive relief was heard by
*Barbara A. Dortch*, J.

A petition filed in the Appeals Court on October 20, 1989,
was considered by *Brown*, J., and questions of law were re-
ported by him.

*Peter J. Gagne* for the plaintiff.

*George M. Matthews* for the town of Franklin.

KASS, J. Upon report by a single justice of this court we
are to consider two questions: (1) whether in connection with
public construction under G. L. c. 149, §§ 44A-44H, an
awarding authority is bound by the substitution procedure
described in G. L. c. 149, § 44F(4)(*c*), if a low sub-bidder
withdraws its sub-bid *after* execution of the general contract;

---

[1]John T. Callahan & Sons, Inc.

and (2) whether, under § 44F(4)(c), a general contractor must obtain executed subcontracts for the subtrades on a job prior to execution of the general contract. When the low filed sub-bidder falls away, the substitution procedure requires the general contractor to look to the next lowest eligible sub-bid- der in the trade concerned, and so on up the line until a sub- bidder in that trade signs up. In this case the town of Frank- lin ("the town") is the awarding authority, John T. Callahan & Sons, Inc. ("Callahan"), is the general contractor, Ras- cicot Masonry ("Rascicot") is the sub-bidder who filed the lowest masonry sub-bid, and Empire Masonry Corp. ("Em- pire") is the next lowest masonry sub-bidder, who would be entitled to the masonry subcontract if the substitution proce- dure is applicable.[2]

We add such details of the history of the controversy as are necessary to consider the questions presented. Callahan was the low bidder with a bid of $2,190,000 to build a police station for the town. Filed sub-bids were opened June 26, 1989. Rascicot's low bid on the masonry component of the job was $595,000.[3] Empire was second lowest with a bid of $661,000. The town conditionally awarded the general con- tract to Callahan on July 20, 1989, subject to appropriation. In mid-August, the town voted the appropriation for the work and on September 5, 1989, executed a general contract with Callahan. The general contractor now called for signed contracts from its designated sub-bidders.[4] By letter dated September 7, 1989, Rascicot informed Callahan that "[d]ue to financial circumstances we are unable to commence this project . . . [and] must regretfully withdraw our bid. . . ."

Empire insisted that it was thereupon entitled to the ma- sonry subcontract. Callahan was entirely willing to have Em- pire do the work, provided that the town adjusted the con-

---

[2]Rascicot's sub-bid was restricted to Callahan. Empire's sub-bid was un- restricted. Nothing turns on this.

[3]As required by G. L. c. 149, § 44B(2), Rascicot accompanied its sub- bid with a bid deposit of five percent of its bid, $29,750.

[4]The record is a bit obscure on precisely when Callahan submitted con- tracts to its prospective subcontractors but during argument counsel agreed that at least Rascicot received a contract to sign on September 5.

tract price to reflect Empire's higher price. The town took the position that it had a contract for a fixed price with Callahan and it was Callahan's problem to find a masonry subcontractor who would match Rascicot's price. On September 26, 1989, Empire brought an action for a declaratory judgment that it was entitled to the subcontract as matter of right under the statutory scheme and for an order restraining masonry work on the Franklin police station job by anybody else. After a Superior Court judge denied injunctive relief, Empire sought review before a single justice of this court under G. L. c. 231, § 118. A laudably pragmatic stopgap solution was arrived at. Empire was to proceed with the masonry work. The town paid $66,000 (the amount by which Empire's bid exceeded Rascicot's lowest bid) into an escrow account, pending decision of the disputed questions, which the single justice referred to a full panel. If we were to decide that the town was bound by the substitution procedure, the escrow fund would be disbursed to Empire in proportion to so much of the masonry work on the job as had been completed; were we to determine otherwise, the escrow fund was to be disbursed to the town. Callahan would then bear the incremental cost.

We conclude that the substitution procedure prescribed by § 44F(4)(c) may apply after execution of a general contract for a public construction job and that it applied in this case.

To set the context we summarize how the public bidding system prescribed by G. L. c. 149, §§ 44A-44H, works. All citations to statutory provisions are to sections found in G. L. c. 149 (1988 ed.). The public agency undertaking the construction project, the awarding authority, provides each general contractor and subcontractor who so requests a set of plans and specifications for the project. § 44B(1). At least four days[5] before the opening of general bids (§ 44F[3]), sealed sub-bids must be filed with the awarding authority, accompanied by bid deposits equal to five percent of the amount of the sub-bid. §§ 44B(2) and 44F(3). Sub-bidders

---

[5]Saturdays, Sundays and legal holidays excluded. That qualification is added to every time limitation which appears in the statutory scheme.

may restrict use of their sub-bids to specified bidders on the general contract (general bidders). § 44F(2). The awarding authority is to open the sub-bids forthwith. § 44F(3).

Within two days, after weeding out all the formally defective bids, the awarding authority sends out a list of the eligible sub-bidders (and their sub-bids) to every person who had requested a set of plans and specifications. § 44F(3). General bidders must choose from among these listed sub-bidders in preparing their bids, *ibid.*, and, like the sub-bidders, they must include a five percent bid deposit with their bid forms. § 44B(2).

Within five days of the opening of the general bids, the awarding authority rejects nonconforming bids (§ 44E[3]) and returns all the general bid deposits, except those of the three lowest responsible and eligible general bidders. § 44B(3). Likewise, the bid deposits of all sub-bidders except those of sub-bidders named by the three lowest responsible and eligible general bids and those of the three lowest responsible and eligible sub-bidders for each trade must be returned within five days of the opening of general bids. § 44B(4). If Federal approval of the contract is not involved, the awarding authority is to award the general contract to the lowest eligible and responsible general bidder within thirty days of the opening of the general bids. § 44A(3).

The selected general bidder then has five days in which to execute a contract with the awarding authority in accordance with the general bid and to furnish performance, labor and materials bonds in the sum of the contract price. § 44E(2). The bid deposits of the three lowest general bidders are returned upon execution and delivery of the general contract. § 44B(3). If the selected general bidder fails to execute the contract and furnish the bonds, the awarding authority keeps the bid deposit as liquidated damages (§ 44B[3]) and awards the contract to the next lowest responsible and eligible general bidder. § 44A(3).

Once selected, the general bidder must "promptly" confer with the awarding authority on the question of sub-bidders. § 44E(2). The awarding authority is entitled to replace any

sub-bidder named in the general bid with a sub-bidder from the prepared list, provided the selected general bidder does not object to that sub-bidder's ability and standing. *Ibid.* There is no statutorily prescribed time within which the selected general bidder must award subcontracts to sub-bidders. The sub-bid form, however, requires that, within five days after presentation of the subcontract by the selected general bidder, the selected sub-bidder must execute a subcontract with the general bidder, "in accordance with the terms of [the] sub-bid, and contingent upon the execution of the general contract, and, if requested so to do in the general bid by the general bidder," furnish a performance and payment bond for the full subcontract price. § 44F(2).

That brings us to the substitution procedure contained in § 44F(4)(c) which this case requires us to construe and apply. Section 44F(4)(c) provides that, if the selected sub-bidder fails to execute the subcontract, "contingent upon the execution of the general contract," and to post the appropriate bonds, within five days after presentation of the subcontract, the general bidder and the awarding authority must award the subcontract to the next lowest responsible and eligible sub-bidder on the list to whose standing and ability the contractor has no objection. The general contract price is "adjusted," i.e., increased, by the difference between the second lowest and the lowest sub-bid. The subcontractor who has declined to sign up forfeits his or her bid deposit to the awarding authority. § 44B(4).[6]

An illustration under this labyrinthine (and mind-numbing) statute may help to demonstrate that substitution of a sub-bidder may occur before or after execution of the general contract. Consider the following scenario. The general con-

---

[6]Section 44B(4) provides that the awarding authority must return the sub-bid deposits still in its possession — i.e., those of the three lowest sub-bidders and of the sub-bidders named by the three lowest general bidders — within five days of the execution of the general contract. This means that sub-bid deposits will be available to the awarding authority to soften the financial blow of substitution only for five days after the execution of the general contract.

tract is awarded on a day we establish as day *one*.[7] One would expect that a general contract is presented to the selected general bidder on the same day as the award. Under § 44E(2), the selected general bidder then has five days after presentation to execute the general contract, i.e., by day *six*. To continue with our illustration, after consulting with the awarding authority immediately after contract award on day *one*, the selected general bidder awards the masonry subcontract to sub-bidder A (the lowest masonry sub-bidder) on day *two*. Under § 44F(2), sub-bidder A has until day *seven* to execute the masonry subcontract. Sub-bidder A fails to sign up before day *seven*. The subcontract, by operation of § 44F(4)(*c*), is, therefore, awarded to sub-bidder B, the second lowest masonry sub-bidder, at B's price. The general contract price is increased by the amount B's price exceeds A's. § 44F(4)(*c*). As the reader will notice, the selected bidder in the example acted very promptly after award of the general contract to sign up sub-bidder A. Nonetheless, the time allowed sub-bidder A to execute the subcontract — five days after presentation — is such that the substitution procedure will inevitably be triggered after execution of the general contract. In fact, the substitution procedure can be triggered before execution of the general contract only if the contractor executes a subcontract prior to being *awarded* the contract, or if the subcontractor bows out before the five days to sign the subcontract have expired.[8]

---

[7]The award of the contract should occur within thirty days of the bid opening. § 44A(3). That period was exceeded in this case, but the general contractor seems to have acquiesced in that, and no party complains of that particular irregularity in the bidding process.

[8]It is possible under the statute for the general contract to be awarded on day *one* and executed on day *six*, and for the general contractor not to award the subcontract to sub-bidder A until two weeks later, on day *twenty*. In this case, substitution could properly occur any time before day *twenty-five*, even though all the sub-bid deposits would have been returned by day *eleven*. (The bid deposits of the three lowest sub-bidders are to be returned within five days after execution of the general contract. Thus, if the general contract is not executed until day *six*, the date to return these bid deposits falls on day *eleven*. See § 44B[4].) A cautious awarding authority might protect itself by requiring the selected general bidder to pre-

Apart from the forty-seven day gap between the selection of the general contractor and execution of the general contract, the facts of the instant case are parallel to those posited in the illustration. Callahan and the town executed the general contract on September 5. By statute, the town could rightfully retain Rascicot's sub-bid deposit until September 10. Callahan presented the masonry subcontract to Rascicot no earlier than September 2, and apparently on September 5. See note 4, *supra*. Rascicot, therefore, had until September 10 to execute a subcontract with Callahan. Rascicot pulled out on September 7.

We are of opinion that the statute raised no bar to the application of § 44F(4)(*c*) at that point, because of the prior execution of the general contract. Section 44F(4)(*c*) "specifically provides the proper route to follow where, as here, there is a failure by the selected sub-bidder to execute a subcontract." *Paul Sardella Constr. Co.* v. *Braintree Hous. Authy.*, 371 Mass. 235, 241 (1976). See also *Paul Sardella Constr. Co.* v. *Braintree Hous. Authy.*, 3 Mass. App. Ct. 326, 330 (1975).[9] That route led to substitution of the next masonry sub-bidder up the line. The only time criterion for substitution prescribed by § 44F(4)(*c*) is that five days must have elapsed after presentation of the subcontract by the general bidder to the lowest sub-bidder before that sub-bidder is deemed to have dropped out.

Step-by-step application of the language of § 44F(4)(*c*) points to invocation of the substitution procedure before or after execution of the general contract. Statutory construc-

---

sent subcontracts to sub-bidders *before* execution of the general contract. Such a requirement would mean that if sub-bidder A failed to sign a subcontract and furnish bonds within five days of presentation, and sub-bidder B were consequently substituted at B's price, the awarding authority would have the benefit of A's sub-bid deposit to offset the increased contract price. If the selected subcontractor defaulted *after* execution of the subcontract, the payment and performance bonds would act as a safety net for the general contractor. While this course of action would be prudent, it is not, as the town suggests, required by the statute.

[9]The *Sardella* cases were decided under G. L. c. 149, § 44I(3), which contained text identical to that which now appears in G. L. c. 149, § 44F(4)(*c*).

tion begins with the well-worn maxim that we apply the plain words of the statute. See *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 420 (1986); *Martin* v. *Rent Control Bd. of Cambridge*, 19 Mass. App. Ct. 745, 747 (1985). The conclusion that the substitution process applies after execution of the general contract finds support in several other provisions of c. 149. Section 44F, subsection (3), 1st par., provides that "the general contract executed on the basis of such general bid shall` [not] be invalid or rejected because of the invalidity of such sub-bid . . .; but there shall be substitution of sub-bidders and adjustment of contract price as if paragraph (c) of section forty-four F(4) were applicable." If the statute contemplates postexecution substitution of sub-bidders in that context, there is no reason to suppose that substitution is prohibited in another — and similar — context. Section 44B(4) allows certain bid deposits of sub-bidders to be held for five days after execution of the general contract. We may infer from that provision a legislative assumption that all subcontracts will not necessarily have been buttoned up on the date the general contract is executed.

What are we to make, then, of the phrase "contingent upon execution of the general contract" which appears in § 44F(4)(c)? Considering the position of the phrase in a fifteen-line sentence and the language we have mentioned in the statute which contemplates postexecution substitution of sub-bids, we take the phrase to *authorize* the execution of subcontracts contingent upon the contractor executing the general contract. Enabling general bidders and sub-bidders to do so has considerable utility. It binds the subcontractor and the subcontractor's bonding company when the general contract comes into legal existence, and it may avoid just the sort of shortfall which developed when, as here, the lowest subcontractor in a particular trade fell away.

Read in this manner, the statute effectuates its apparent design of substituting for a lapsed lowest bidder the next-to-the-lowest bidder and of confining the subcontractors to those who have participated in the public sub-bidding procedure. See *Interstate Engr. Corp.* v. *Fitchburg*, 367 Mass. 751, 757-

758 (1975). At this juncture it is appropriate to wheel up equally trusty canons of statutory construction: to consider the whole system of which the statute is a part, *Pereira* v. *New England LNG Co.*, 364 Mass. 109, 115 (1973); "to best effectuate the legislative intent, viewing the statute as a whole," *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. 688, 696 (1984); to give the statute a reasonable construction, *School Comm. of Greenfield* v. *Greenfield Educ. Assn.*, 385 Mass. 70, 79-80 (1982); to consider the main object of the statute, *Newbury St. Assoc.* v. *Assessors of Boston*, 386 Mass. 513, 515 (1982); and to harmonize the troublesome passage, *Risk Mgmt. Foundation of the Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass. 498, 503 (1990).

We are not persuaded by the town's argument that application of the substitution procedure unreasonably exposes awarding authorities to unexpected increases in the cost of the project. As we observed in note 8, *supra*, one way in which an awarding authority can avoid that risk is to require the successful bidder to execute subcontracts (for trades as to which sub-bids were filed) before execution of the general contract. An awarding authority may also diminish its exposure by retaining bid deposits as long as § 44B(4) permits. Had the town done so in this case it would have had Rascicot's $29,750 bid deposit to set against the $66,000 by which Empire's bid exceeded Rascicot's. Finally, we do not think the town's reliance on *JJ Assocs.* v. *Fall River Hous. Authy.*, 19 Mass. App. Ct. 45, 48-51 (1984), is at all cogent. That case dealt with the right of the public authority to require substitution of a *lower* sub-bid at a time when the general contract itself was still contingent because it was subject to approval by the United States Department of Housing and Urban Development.

Returning to the questions posed by the single justice, we answer that: (1) the general contractor and the town are bound to apply the substitution procedure prescribed in § 44F(4)(*c*), notwithstanding the prior execution of the general contract; and (2) a general contractor is not required by

§ 44F(4)(*c*) to obtain executed subcontracts (with the sub-bidders the contractor intends to use) prior to the execution of the general contract.

The town and Callahan shall execute a change order increasing the general contract price by $66,000, and the escrow funds shall be disbursed in accordance with the order of the single justice and the stipulation of the parties dated November 14, 1989.

*So ordered.*